**COLTEC INDUSTRIES, INC., Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 01–072T.

United States Court of Federal Claims.

Oct. 29, 2004.

Stephen D. Gardner, Kronish, Lieb, Weiner & Hellman, LLP, for plaintiff.

Stuart J. Bassin, United States Department of Justice, Tax Division, Washington, D.C., for defendant.

## OPINION

BRADEN, Judge.

Many years ago, the United States Supreme Court in *Atlantic Coast Line v. Phillips*, 332 U.S. 168, 67 S.Ct. 1584, 91 L.Ed. 1977 (1947), quoting from prior decisions of Justice Holmes and Judge Learned Hand, observed:

---

1. The relevant facts recited herein were derived from the following portions of the record: Plaintiff's February 13, 2001 Complaint ("Compl."); Defendant's Exhibits ("DX"); Joint Exhibits ("JX"); Plaintiff's Exhibits ("PX"); Trial Exhibits ("TX"); Transcript of Trial Held May 3–7, 11–12, 14, and 17–18, 2004 ("TR"); Transcript of Oral Argument Held September 29, 2004 ("A–TR").

Certain testimony, exhibits, and argument currently are subject to a Protective Order issued by

As to the astuteness of taxpayers in ordering their affairs so as to minimize taxes we have said that 'the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it.' This is so because [there is no] 'public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions.'

*Id.* at 172–73, 67 S.Ct. 1584 (internal citations omitted). And, that is what happened in this case.

### RELEVANT FACTS [1]

The Government describes this tax refund dispute as follows:

Hoping to avoid tax on its substantial capital gains, Coltec [Industries, Inc.] adopted an off-the-shelf corporate tax shelter scheme developed by Arthur Andersen LLP . . ., which was designed to create an offsetting, artificial tax "loss"—without any corresponding economic loss—through a complex series of prearranged steps . . . that were intended to have no other material impact upon Coltec.

Gov't Post–Trial Memorandum at 1–2. The record presents a different picture.

**A. Asbestos Litigation In The United States.**

Asbestos was widely used in the manufacture of countless industrial, commercial, and household products for many years. TR 52–56; *see also* Stephen J. Carroll et al., *Asbestos Litigation Costs and Compensation: An Interim Report*, RAND INSTITUTE FOR CIVIL PRACTICE 13–15 (2002) ("RAND"). In 1973, the United States Court of Appeals for the Fifth Circuit held that asbestos manufacturers had a duty to warn industrial insulation workers who came into contact with asbestos of the dangers associated with the use of that

the court on August 11, 2004 during a telephone conference with the parties. Although the court considers none of the information contained in this Opinion and Partial Judgment to be confidential, the underlying documents will remain under seal until the court is able to design a procedure for making as much of the record as possible public.

product and that manufacturers and distributors of products utilizing asbestos could be held jointly and severally liable. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1103 (5th Cir.1973) (Wisdom, J.), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *see also* TX 6 at 5 & n.5. The tsunami of cases filed after *Borel* resulted in multi-million dollar jury damage awards, many of which included punitive damages. TX 6 at 5–6; TR 2380–83. As a result, the financial viability of companies that manufactured or distributed products utilizing asbestos, as well as their insurance companies, was placed in jeopardy. TX 6 at 5–6; TR 56–57; 635–36; 1584–85. By the end of 1982, over $1 billion had been spent on compensation and litigation expenses associated with over 21,000 asbestos liability claims, and three major corporations had filed for Chapter 11 bankruptcy protection, "identifying the costs of asbestos litigation as the principal reason for the filing." RAND, at 6.

Johns–Manville Corporation ("Johns–Manville") was one of these manufacturers. In the face of an estimated 35,000–180,000 potential asbestos claims, Johns–Manville filed for Chapter 11 protection in 1982. TX 10 at ¶ 5.2. The reorganization plan established a trust to pay future claimants, pursuant to an administrative schedule that estimated the liquidated value of the amount due for each claim. *See In Re Johns–Manville Corp.*, 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part, Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988). When the Manville Trust was established in 1988, it was estimated that 87,000–100,000 new claims would be filed over the life of the Trust, which was funded with over $2 billion. TX 10 at ¶ 5.2. By the end of 1989, the Manville Trust received over 140,000 claims, and new claims were being filed at the rate of 17,000 per year. TX 10 at ¶ 5.2.

Within one year, not only did the number of claims exceed the projected total for the life of the trust, but the average settlement costs per claim were running 65% higher than projected. TX 10 at ¶ 5.2. By 1990, however, the solvency of the Trust was at risk, so United States District Court Judge Jack Weinstein ordered all payments to cease until a panel of independent experts could be appointed to develop a statistical model to project future claims to better estimate the potential for new claims and a new plan of reorganization could be proposed. PX 13, 18; TR 1587. At that time, the number of projected claims over the then projected life of the Trust (1990 through 2049) was estimated to be more than 365,000; triple the number projected in 1988. PX 18 at GEXP 07019; TX 10 at ¶ 5.2; *see also* PX 150 at BOA 815. The 1993 Manville Report projected that approximately 445,000 claims would be filed against the Manville Trust between 1990 and 2049. PX 13 at GEXP 06964. The 1994 Manville Report forecasted approximately 365,000 claims. TX 10 at ¶ 5.2; PX 18 at GEXP 06988; TR 1587. This Report warned, however, that the actual claims filed might depart up or down from the forecast by as much as 50%, and did not assign any probability of the likelihood that the "High" projection of the number of claims (365,000 × 1.5) would be exceeded. PX 18 at GEXP 7011; TR 1588–89.

The new plan proposed to pay claims at a rate of 10% of their liquidated value. *See In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F.Supp. 473 (E.D.N.Y. 1995), *aff'd in part, vacated in part*, 78 F.3d 764 (2d Cir.1996). Payments were made at this rate for the next six years despite an increase in filing of new claims. In 1994, claims filed against the Manville Trust increased by 73% over the prior year. In 1995, they increased by another 77%. PX 150 at BOA 814; TR 1581–83. Compared with 1994, actual filings in 1995 increased by 188%. PX 150 at BOA 814; TR 1581–83, 1591, 1595. In 1996, filings against the Manville Trust again exceeded the amount projected. PX 18 at GEX P7019; TR 1592–95. By 2000, actual claims filed increased to 449,-000 or twice what was predicted in 1981. PX 18 at GEX P7019. Consequently, in 2001, the Manville Trust again was required to revise the 1994 forecast of 365,000 claims (1990–2049) by 72.6%, *i.e.*, up to 630,000. TX 10 at ¶ 5.5. As of July 2003, over 643,000 claims had been filed against the Manville Trust. TX 10 at ¶ 5.2.

The experience of Johns–Manville was similar to that of other manufacturers and distributors of asbestos products. PX 18; *see also* RAND, at 80. In the 1980's, sixteen companies filed for bankruptcy to protect their assets from increasing asbestos liability claims; in the 1990's, an additional eighteen companies filed; and from January 2000— Spring 2002, twenty-two other companies filed. RAND, at vii.

At the same time that asbestos manufacturers and distributors sought bankruptcy protection, many of their insurance companies became insolvent. In 1994, the United States insurance industry estimated the cost of past and future asbestos liabilities at $20 billion. PX 368; TX 6 at 9; TX 10 at ¶ 5.3. By 1996, that estimate was increased by 50% to $30 billion. TX 10 at ¶ 5.3. By 2000, the industry estimated the cost of past and future asbestos liabilities could reach $48 billion by 2003. PX 368; TX 6 at 9; TX 10 at ¶ 5.5; *see also* RAND, at 54 ("U.S. insurance companies ... report that [they] have spent about $21.6 billion on asbestos claims through 2000 ... [W]e believe foreign insurers have spent $8 to $12 billion through 2000, over half of which has been assumed by London.").

Seeking deeper pockets, asbestos plaintiffs began to assert corporate veil piercing claims designed to hold parent companies liable for the asbestos-related activities of their subsidiaries and/or successor companies. *See* FRANKLIN A. GEVURTZ, CORPORATE LAW § 1.5, 70 n.1 (2000) ("GEVURTZ") ("[C]ourts pierce the corporate veil to impose liability for a corporation's debt upon ... an individual controlling a corporation ... or *corporations under common control with the debtor corporation*.") (emphasis added); *see also* PX 365–66; TX 6 at 4–7; TR 2380–87. By 1996, at least nine companies that were defendants in asbestos litigation faced such claims and, in seven of those cases, the federal and state courts involved ruled that the corporate veil could be pierced. PX 365–66; TX at 5–6.[2]

## B. The Coltec Group.

In 1996, Coltec Industries, Inc. ("Coltec") was a publicly-traded holding company comprised of twenty-eight separate companies (hereinafter collectively "the Coltec Group") with net sales exceeding $1 billion and equity value of $1.5 to $2 billion. JX 85; TR 71; AR 160.

In 1976, Coltec acquired Garlock, Inc. ("Garlock"), a profitable corporation. JX

---

**2.** *See, e.g., Baltimore v. Keene*, 6–6 Mealey's Litig. Rep. Asb. 41 (Md. Cir. Ct., Baltimore Co., Apr. 18, 1991) (holding that genuine dispute existed as to parent's control over subsidiary's asbestos activities); *Schmoll v. ACandS, Inc.*, 703 F.Supp. 868 (D.Or.1988) (finding parent company to be successor in liability to subsidiary organized solely to escape asbestos liabilities of predecessor); *Parker v. Bell Asbestos Mines, Ltd.*, No. 83–3289, 1986 WL 2894, 1986 U.S. Dist. LEXIS 28687 (E.D.Pa. Mar. 3, 1986) (allowing veil piercing where parent corporation controlled all significant financial and administrative actions of subsidiary); *Scharold v. GAF Corp.*, No. C–1–84– 1062, 1985 U.S. Dist. LEXIS 23540 (S.D.Ohio Jan. 10, 1985) (finding that parent corporation controlled all of subsidiary's production-related decision-making); *Lloyd v. Pfizer, Inc.*, No. C–1– 84–397, 1985 U.S. Dist. LEXIS 22557 (W.D.Ohio Feb. 15, 1985) (holding that subsidiary was merely an alter ego of parent corporation). The defendants in the *Baltimore* and *Scharold* cases share the same parent company, Turner & Newell, LLC.

In addition, although a United States Bankruptcy Court Judge found no basis to pierce the corporate veil, such claims were part of a reorganization plan settling the case. *See In re Hills-*borough Holdings Corp. v. Celotex Corp.*, 197 B.R. 366, 369 (Bankr.M.D.Fla.1996) ("Under the [Veil Piercing Settlement Agreement], Walter Industries, the reorganized entity paid $375 million in cash and securities to the Celotex Settlement Fund, to be held in trust for the benefit of the asbestos-related personal injury claims in the Celotex reorganization."). Two other cases also were settled after a United States District Court held that assets fraudulently were transferred to subsidiaries to avoid payment of asbestos liabilities. *See In re W.R. Grace & Co.*, 18–12 Mealey's Litig. Rep. Asb. 14 (Bankr.D. Del. June 25, 2003) (approving a settlement where defendant funded its bankruptcy estate with $115 million one-time lump sum payment); *In re W.R. Grace & Co.*, 2–5 Mealey's Asb. Bankr.Rep. 2 (Bankr.D.Del. Nov. 29, 2002) (approving a settlement where the defendant paid claimants on behalf of predecessor corporation).

In 2002, increasing concerns about veil piercing resulted in the Commonwealth of Pennsylvania enacting the "Fair Share Act" to prevent plaintiffs with asbestos claims "from gaining disproportionate recoveries against 'deep pocket' defendants, only minimally responsible for the plaintiff's injuries." "The Issue: Asbestos Litigation," Washington Legal Foundation (Spring 2003) ("WLF: ASBESTOS LITIGATION") at 8.

85 at GX 24406–07; PX 97 at COLT 18443; PX 448; TR 48–50, 257–58, 278. One of Garlock's companies, Garlock Mechanical Packing Company, had annual sales of approximately $250 to $300 million and manufactured industrial sealing products and expansion joints utilizing asbestos as a primary component in the manufacture of gaskets and in pump and valve packings. DX 44A; TR 48–52, 257. Another Garlock company, Stemco, Inc. ("Stemco"), manufactured products for trucks and other heavy automotive vehicles and had annual sales of approximately $80 to $100 million, but Stemco did not utilize asbestos in manufacturing any of its products. TR 49–50, 258, 454–55.

In 1987, Garlock acquired Anchor Packing ("Anchor"), a manufacturer and distributor of industrial gaskets, pump packings, valves, and mechanical seals. TR 50–52. Anchor did utilize asbestos in manufacturing these products. TR 50–53, 74–76, 257. In 1993, Coltec decided to discontinue Anchor's business operations. PX 10 at KC 03185. By 1996, Anchor's only assets were nearly depleted insurance coverage and a small building in Louisiana. TR 673–74.

## C. On April 1, 1992, The Coltec Group Established A Litigation Management Department.

By the early 1990's, Anchor and Garlock were or had been defendants in approximately 100,000 asbestos cases. TR 58–59, 773. Prior to 1991, asbestos claims against Anchor and Garlock primarily were handled by their insurance carriers. PX 6A–7; TR 60–62, 98–99, 773–74.

In March 1991, John Guffey was named President and Chief Operating Officer of the Coltec Group. TR 47, 59–60. Prior to that time, Guffey had been President of Garlock and therefore was familiar with the asbestos litigation. TR 59–60. During the mid 1970's, however, Guffey also served as a representative of Aeroquip Corporation at meetings of the Asbestos Textile Institute in Washington, D.C., where the health risks associated with asbestos were discussed. TR 54–59. In September 1991, Guffey assumed primary responsibility for reformulating Coltec's asbestos liability management strategy. JX 2; PX 8. Guffey was very concerned that Garlock did not have a long-term strategy for management of asbestos litigation, including dealing with potential veil piercing claims, and he did not want these issues to distract management or cause problems with the daily operations of Garlock or other Coltec Group companies. PX 9; TR 59–65, 636–38. Guffey believed that asbestos litigation issues needed to be assigned to a group dedicated exclusively to that function that was physically and otherwise isolated from other Coltec Group operational and management functions. JX 3–4; TR 59–61. In addition, Guffey wanted a more "hands on" and aggressive approach to controlling defense costs. TR 59–63. As one of his first priorities as CEO of Coltec, Guffey decided to create a unit within Garlock that would be solely responsible for managing asbestos litigation and relations with the insurance carriers (the "Asbestos Litigation Department"). JX 3–4; TR 59–63, 637–38. Timothy O'Reilly, an experienced asbestos defense litigator, was hired to head the Asbestos Litigation Department, which became operational on April 1, 1992, and was located in Palmyra, New York, a mile away from Garlock's operations. TR 63, 631, 639–40, 774–76.

At the time O'Reilly joined Coltec, asbestos claims filed against Anchor were handled by seven or eight insurance carriers. TR 641. Within six months, Zurich, Anchor's primary carrier, exhausted its $6.5 million coverage. TR 643–44. Shortly thereafter, Liberty Mutual also exhausted its coverage of $19.5 million. *Id.* This alarming development motivated O'Reilly to organize a consortium of the four largest remaining insurance carriers, with which he would meet two or three times a week so "they wouldn't dissipate the funds so quickly." TR 644. During the next two years, O'Reilly undertook a systematic program to control Coltec's asbestos litigation exposure: *e.g.,* internal staff of lawyers and paralegals were hired and primary control of the litigation was taken in-house; a database of the claims filed against Garlock and Anchor was created to monitor the status of those cases; the number of outside defense firms was reduced and

their fees were cut 5% across the board; a roster of expert witnesses was developed; communication with Garlock's insurance carriers was improved to facilitate the recovery of Garlock's costs; and communication with the plaintiffs' bar was improved to reduce costs and facilitate settlements. JX 8; PX 17; TR 104–06, 639–59, 743–46, 776–91, 908–09. In addition, O'Reilly implemented procedures so that claims could be submitted directly to him for reimbursement without necessitating a court filing. TR 105–06; 789–90. O'Reilly also negotiated "buy-back" agreements with several of Anchor's insurers. TR 641–45. Centennial paid Anchor a lump sum of $27 million, and INA paid $9,750,000 to settle all existing and future asbestos claims and cancelled their policies. PX 11; TR 645. O'Reilly put these proceeds aside in "trust" and used them to satisfy future Anchor judgments, settlements, and associated defense costs. TR 645–46. In addition, by June 1995, O'Reilly was successful in persuading ten of Garlock's twenty-eight carriers to cover a portion of the Asbestos Litigation Department's costs, by threatening to turn the Department into a law firm. PX 26 at COLT 16005–06; TR 659–66, 791–93, 803–05.

**D. By June 6, 1996, The Coltec Group Decided To Establish A "Case Management Subsidiary."**

**1. Deliberations Of Management.**

From May 1995 until the Coltec Group was sold in 1999, Joseph Andolino, an Officer and Vice President of the Coltec Group, had responsibility for industrial operations, business development, and a variety of overall corporate issues, including tax. TR 133–35. Andolino had frequent discussions with Coltec senior management about the uncertain and growing asbestos liability situation. TR 140–44.

Late in 1995, Andolino convened a meeting at Coltec's offices with Arthur Andersen,

Coltec's accounting firm and auditor, to discuss overall tax planning. TR 145–46. Among the issues Andolino asked Arthur Andersen to explore were "mixing bowl partnerships and Morris Trust-type transactions so that we could get up to speed on current rules associated with those transactions[.]" TR 146. Andolino also wanted to discuss an anticipated $240 million of capital gain that Coltec might realize if and when Holley Automotive was sold, which Andolino stated he "was setting about ways to mitigate[.]" TR 146; *see also* JX 11–12, 17. The discussion at the meeting revealed that the Morris Trust and "mixing bowl" partnership options did not "fit" Coltec's purposes. TR 149.

As that meeting was ending, an Arthur Andersen partner mentioned to Andolino that he was aware that Coltec had significant contingent liabilities and knew of a transaction that another company had undertaken wherein contingent liabilities were transferred into a "litigation management activity fund." TR 150. Andolino remembered that "there was a tax benefit associated with it." TR 150. Andolino saw this option as an opportunity to remove O'Reilly and his staff from Coltec's payroll and out of a building leased by Coltec, which Andolino thought would be beneficial because "there were grave concerns about veil piercing [a]nd it seemed to me that such a restructuring would put a certain orderliness to our corporate affiliates in such a way that it would ameliorate those concerns." TR 152, 361–62. Andolino also concluded that this type of transaction would be of particular interest to Guffey since it was consistent with Coltec's ongoing strategy "to isolate the asbestos problem." TR 151.

Andolino next met with Coltec officers and senior managers, including Guffey and O'Reilly, to discuss this proposal. TR 152–53, 157–59. Andolino retained the law firm of Kronish Lieb Weiner & Hellman ("Kronish Lieb") to provide legal advice. TR 153, 362.[3] In turn, Kronish Lieb retained Arthur

---

**3.** It appears that this was indeed a busy time for Mr. Turlington, one of Coltec's counsel from Kronish Lieb. *See Long Term Capital Holdings v. United States*, 330 F.Supp.2d 122, 142 (D.Conn. 2004) ("In early 1996, ... B & B [an investment banking firm in the business of asset-based fi-

nancing] approached Donald R. Turlington ... who served as regular tax counsel to Long Term in the mid–1990's. [B & B] discussed with Turlington the potential placement of preferred stock with high basis ... [B & B] agreed, that if Turlington assisted in the placement of the stock,

Andersen to preserve and extend attorney-client privilege to Arthur Andersen's work product. DX 191; TR 153–54, 362–64. At trial, Andolino candidly admitted: "[A]lthough my belief was that [the Garrison transaction] was properly taken, I also realized that I could be wrong. It is a novel matter of first impression. I couldn't find any precedent. So as I thought about it, I don't know that I anticipated litigation, but I anticipated an examination. It is a large number. And my expectation was that the Internal Revenue Service might disallow it." TR 363–64; *see also* JX 14–15.

Although Andolino informed Guffey of the potential tax benefits, Guffey testified that he would have approved the restructuring in any event because of the benefits of protecting the assets of Coltec and Garlock from veil piercing claims. TR 86–87. The new and separate corporation would have its own budget, financial books, negotiate its own service contracts, and maintain control over issuance of settlement checks. TR 68–73, *see also* TR 686–87, 710–11, 904–05, 1150. Guffey believed that the proposed transaction could further achieve operational objectives that he had been pursuing since he became President and CEO of the Coltec Group, as well as be helpful in recovering the costs of litigation management from Garlock's insurers. TR 68, 87, 159–63, 803–05. O'Reilly concurred in Guffey's decision to create a separate litigation management company, primarily because it would help O'Reilly better identify and allocate costs so that additional insurance carriers might agree to contribute to the costs of managing Garlock and Anchor asbestos liabilities and potentially focus plaintiffs' attorneys on one pocket for recovery. TR 163–65, 685–91, 711–13, 803–05, 1150, 1186–87; *see also* TR 68–70. O'Reilly testified that he also appreciated that placing the asbestos liabilities into a separate corporation could only help improve efforts to maintain Garlock's and Coltec's separate corporate identity to avoid "veil piercing" claims. TR 686, 711. The sale of the litigation management company's stock to financial institutions, with which Coltec had or may have a relationship, was not one of the factors that Guffey or O'Reilly initially considered. TR 73–74. Both, however, saw a potential opportunity to align the financial interests of outside defense counsel more closely with Coltec, if they purchased stock in the litigation management company. TR 73–74. For all of these reasons, Guffey authorized Andolino to proceed with development of the proposed reorganization, subject to continued consultation. TR 86–87, 153, 157–58, 162–63, 685, 803–05.

On April 29, 1996, Coltec's Senior Vice President and CFO circulated a memo to Andolino summarizing the proposed "case management subsidiary" and impact on the Coltec Group:

> Overall, the objectives for Garlock Case Management include first, the segregation and focus of asbestos claims management and second, to provide equity-like financial incentives directly and indirectly to certain of those persons involved in impacting the contingent asbestos exposure.

PX 45 at COLT 18104; TR 190–96.

On May 2, 1996, Coltec senior management and representatives from Kronish Lieb and Arthur Andersen first met to discuss formation of a "case management subsidiary." TR 365–66; DX 194. Other working meetings were convened on May 30, 1996 and August 8, 1996. TR 552–53; DX 202, 325.

In June 1996, Coltec sold Holley Automotive to Borg–Warner Automotive, Inc. for $283 million. JX 30; PX 43–44, 53.

### 2. Outside Consulting Firms Were Retained To Estimate Garlock's And Anchor's Contingent Asbestos Liabilities.

It was very important for Coltec to establish a liability management company that was

---

B & B would compensate Turlington with a percentage of the profits B & B earned from the placement. Shortly [thereafter,] Turlington approached [Long Term] about an idea involving preferred stock he thought might be beneficial ... Turlington summarized a transaction in which an investor that owned a security with a tax basis higher than the value of the security would contribute the security to [Long Term] in exchange for a partnership interest and, if [Long Term] subsequently were to purchase the investor's partnership interest before *Portfolio* sold the contributed securities, the tax law would permit 'the tax deduction[.]' ") The United States District Court in *Long Term* disallowed the deduction in that case.

capitalized with sufficient assets to pay anticipated future net asbestos liabilities after insurance. TR 691; *see also* GEVURTZ § 1.5, at 91 (citing Robert B. Thompson, *"Piercing The Corporate Veil: An Empirical Study,"* 76 CORNELL L. REV. 1036, 1066 (1991) (concluding that courts pierced the corporate veil between seventy and seventy-five percent of the time when they found inadequate capitalization.)). Although O'Reilly and the Asbestos Litigation Department initially made some rough estimates of Garlock's and Anchor's contingent asbestos liabilities [TR 691–701], Tillinghast Towers–Perrin ("Tillinghast"), an international consulting firm that specializes in the analysis and projection of asbestos and pollution liabilities, was hired in May 1996 to conduct a professional analysis. TX 4 at ¶¶ 1.1–1.3; JX 16, 19, 21; PX 71, 363; TR 197–98, 250, 494–98, 525–27, 533, 691–702.

First, O'Reilly provided Tillinghast with several years of asbestos litigation data, including detailed information concerning claims filings, settlements, dismissed cases, and outside legal expenses for Anchor and Garlock. PX 52; DX 74; TR 495–98, 554–55, 702. Then, Tillinghast prepared various estimates of future Anchor and Garlock asbestos liabilities, on a gross basis, not taking into account the extent of insurance coverage. DX 166; PX 55–56, 66, 78; TX 4 at ¶¶ 4.1–4.6, 6.1–7.3; TX 5 at ¶¶ 11–20; TR 491–508, 608–25. In preparing these estimates, Tillinghast utilized different variables, including estimates of projected asbestos claims of the 1994 Manville Trust. PX 78 at DTP 2506–10; TX 4 at ¶¶ 5.1–7.2; TR 513–14, 1584–90. After adjusting those projections to account for the difference in the number of claims filed in the past against the Manville Trust and Garlock/Anchor, Tillinghast decided to use the 1994 Manville Trust Report as the basis for its projections of future filings against Garlock/Anchor. TX 4 at ¶¶ 5.1–5.5; PX 78 at DTP 2506.

Because of the volatile nature and inherent difficulty of estimating future asbestos liabilities and knowing that past estimates proved to be highly inaccurate, Tillinghast decided it was more reasonable to calculate a range of estimates of Garlock's and Anchor's estimated contingent asbestos liabilities, rather than submit a single projection. TX 4 at ¶¶ 7.2–7.3; PX 55, 78 at DTP 2509–10; TR 579–80. Using three of nineteen potential scenarios, Tillinghast calculated "Low," "Medium," and "High" estimates of potential gross liabilities. TX 4 at ¶ 7.3; PX 55, 66, 78 at DTP 2503, 2514–15, 2520; TR 500–03, 535–38, 567–75, 600–01. No probabilities were assigned to the likelihood that the actual gross liabilities facing Anchor and Garlock would turn out to be lower than, equal to, or greater than any of these projections. TR 509, 541. On May 30, 1996, the preliminary results of Tillinghast's work were presented to Coltec. TR 548–50. Coltec's management was surprised the estimates were so high. TR 552–54, 566–67.

Tillinghast's estimates of gross liabilities, however, did not take into account the extent of insurance recovery, which was performed separately by another outside expert, Kahn Consulting, Inc. ("Kahn"). PX 358; TX 4 at ¶ 7.1; TX 5 at ¶¶ 3, 11; TR 510, 608. Kahn had worked with Coltec since 1990 on a variety of other assignments relating to insurance coverage. TX 5 at ¶ 3; TR 811. Since Garlock had "more than 30 insurance companies providing coverage with some years having more than 35 different policies in effect and a total of approximately 236 policies in effect between 1976 and 1984," it was important to determine which policies should be applied to specific claims. Many of the policies treated the payment of defense costs as distinct from indemnity payments. TX 5 at ¶¶ 6, 8. In connection with this work, Kahn developed a methodology for determining how the multitude of insurance policies issued by numerous carriers should be applied to Garlock's asbestos liabilities. TX 5 at ¶¶ 3–4, 8–9; JX 20, 23, 25; PX 19–20. Kahn developed a computer model to apply this methodology, named the "Rising Water Allocation Model." TX 5 at ¶¶ 3–4, 8–9; JX 20, 23, 25; PX 19. This Model also was used to generate invoices for the various insurance carriers concerning the amount of reimbursements owed to Garlock. TX 5 at ¶ 10.

In June 1996, Tillinghast provided Kahn with the "Low," "Medium," and "High" revised undiscounted cash flow projections of

Anchor's and Garlock's gross contingent asbestos liabilities that showed, on an annual basis, the dollar amounts for settlements and defense costs through 2056. DX 166; PX 55; TR 500–05, 610–14. Kahn then input these projections into the "Rising Water Allocation Model" and computed the projected amounts of asbestos-related costs that would, or would not, be covered. PX 55; TX 5 at ¶¶ 8–15; TR 610–25. Kahn also "present valued" Garlock's net future asbestos liabilities with "Low," "Medium," and "High" estimates, at various rates ranging from 3% to 8%. TX 5 at ¶¶ 16–18.

On or about July 17, 1996, Kahn issued a draft report estimating the insurance coverage that might be available for the years 1976–1983. JX 24; TX 5 at ¶ 19; TR 612. It did not, however, address the issue of the collectibility of the projected insurance reimbursement, because it was assumed that the carriers that were solvent as of July 1996, would pay their policy obligations in full. JX 64 at BA 962, 965; PX 78 at DTP 2499; TR 510–11, 621–22. To the extent that carriers became insolvent, or chose to contest coverage, the amount of insurance coverage would be reduced, and Garlock's net uninsured liability would be higher than what Kahn projected. PX 78 at DTP 2499. Coltec was particularly concerned that policies issued by Royal Insurance for the period July 1983– July 1984, in the amount of $254 million, might not be paid because of the questionable financial condition of that insurance company. JX 24 at COLT 30517; TX 5 at ¶ 19; TR 612–13. Therefore, Coltec asked Kahn to re-project the net liabilities for the "High" estimate, assuming 80% coverage, which Kahn did by a July 19, 1996 letter, in which the net contingent liability under the "High" estimate decreased by approximately $119 million (on an undiscounted basis) and $8 million (discounted at 7%) from the estimates in the July 17, 1996 draft Kahn Report. JX 24 at COLT 30522; JX 26 at KC 07561; TX 5 at ¶¶ 19–20; TR 614–16.

The July 17, 1996 Kahn Report, as revised, was provided to Tillinghast, which incorporated Kahn's conclusions into an August 14, 1996 Report (the "Tillinghast Report"). PX

78; TX 5 at ¶¶ 19–20. The Tillinghast Report set forth the results of the present-value calculation, determining that discounting the net liability estimates at 5%, 6% and 7% was considered reasonable. PX 78, PX 145 at BA 1053, PX 150 at BOA 818; TX 5 at 3–11; TR 617–18, 1545–47, 1600–01, 1701, 1733–34. The Government's expert, P.J. Eric Stallard, one of the co-authors of the 1994 Manville Trust Report, testified that the "Low," "Medium," and "High" estimates, set forth by the Tillinghast Report, "were reasonable projections" of the combined Garlock and Anchor uninsured asbestos liabilities. TR 1733–34.

Based on the Tillinghast and Kahn Reports, Garrison was capitalized with assets estimated to be reasonably sufficient to cover the "High" estimate of net liabilities (after insurance coverage), with a present value discount rate of 7%, i.e., or $371.2 million. JX 26 at KC 07561; PX 78 at DTP 2513; TR 200–01. Given the nature of the liabilities at issue and the difficulty of predicting future asbestos litigation, however, Tillinghast's Report included the following caveat:

> The technological, judicial, and political climates involving toxic torts such as asbestos are changing, and historical data cannot be used for standard actuarial projections. As a result, any projection of liabilities for asbestos is subject to much greater uncertainty than would normally be associated with a review of reserves for general and products liability exposures other than asbestos claims. We have conducted our review based on a variety of assumptions which are subject to change. While we believe that the methods and assumptions we have used to project asbestos contingent liabilities are reasonable at this time, it is important to understand that they are likely to change as more information becomes available.

PX 78 at DTP 2498.[4]

### E. On September 13, 1996, The Garrison Litigation Management Group Commenced Operations.

On June 6, 1996, before the Kahn Report was completed, a corporate decision was

---

4. In fact, Anchor's and Garlock's financial exposure was underestimated. PX 78 at DTP 2907;

reached in Coltec to establish a "case management subsidiary." JX 18 at 5–6. Within a month of the issuance of the Kahn Report, all of the steps to implement this subsidiary were ready to be executed.

Coltec owned all the outstanding stock of Pennsylvania Coal and Coke, Inc., which previously had discontinued business operations, but was still obligated to pay out "black lung" benefit payments. PX 448; TR 259. On July 25, 1996, the name of PCC was changed to Garrison Litigation Management Group, Ltd. ("Garrison"). PX 69, PX 97 at COLT 18386–88, PX 143; TR 260.

To effect capitalization of Garrison, Garlock caused Stemco to issue an August 1, 1996 promissory note to Garlock in the amount of $375 million (the "Stemco Note"), for slightly more than the Tillinghast/Kahn "High" estimate, with interest payable quarterly at an initial rate of 8.25%, adjustable quarterly to the prime rate, and a maturity date of August 1, 2011. JX 26 at KC 07561, 27, 40; PX 78 at DTP 0002513; TR 250–54, 264–65. The "High" estimate was selected because Coltec was aware that the asbestos liability estimates relied on by the Manville Trust were greatly underestimated, and it was in Coltec's interest to fund Garrison on a

conservative basis. TR 250–51. Of the $375 million principal amount, approximately $263 million was issued in satisfaction of an existing intercompany loan that Stemco owed to Garlock. JX 13 at AA 015019; PX 328, 449; TR 168–71, 265. The $112 million balance was made as a "distribution" to Garlock as Stemco's sole shareholder. JX 13 at AA 015019; PX 328, 449; TR 168–71, 265.

To assure that Stemco would have sufficient assets and operating cash to meet its obligations under the note, an intercompany payable in the amount of $314,781,121, owed by Garlock to Stemco was converted into a demand promissory note in that amount on August 31, 1996 (the "Garlock Note"). JX 28 at COLT 22444–46, JX 29; TR 265–68. The Garlock Note bore interest at a rate of 8% per annum and was payable on demand, which was to occur no later than August 31, 2011. JX 28 at COLT 22444. When demand for payment of any portion of principal was made, the interest rate increased to 10% per annum of the outstanding principal amount. *Id.* In the event demand for the principal was made, accrued interest was payable on demand. JX 28 at COLT 22444. The Garlock Note also contained a provision requiring Garlock to pay all litigation costs associated

PX 491 at ROC 24752; TR 2707–08; *see also* RAND, at 15 (emphasis added) ("We have not been able to find any epidemiological study that has systematically investigated asbestos exposure and asbestos-induced disease that includes all industries and corporations in the U.S., although some analysts have examined patterns of legal claiming by industry. Although some studies project cases of disease, not deaths, *no study has provided a reliable estimate of how many people are sick at a given point in time as a result of occupational exposure to asbestos.*").

In 1995, claims exceeded the Tillinghast "High" projection by approximately 15% for lung cancer, 10% for mesothelioma, and over 100% for non-malignancies. PX 373–75; TX 7 at ¶ 34. Tillinghast, however, treated this as an aberration, and assumed that filings thereafter would return to the projected levels. PX 78 at DTP 2907; TX 10; TR 2707–08.

In 1996, actual filings against Garlock exceeded 50,000 or almost double the Tillinghast projection of 24,263. PX 78 at DTP 2907; PX 491 at ROC 24752; TR 2707–08.

In February 1997, Tillinghast issued a revised report that projected the gross contingent asbestos liabilities arising from claims against Garlock, as of December 31, 1996, at: $1.28 billion "Low;" $1.53 billion "Medium;" and $1.98 bil-

lion "High." PX 181 at DTP 2982; PX 446; TR 517–19. In August 1997, a revised report was issued showing claims against Anchor as of April 30, 1997, at: $196 million "Low;" $290 million "Medium;" and $364 million "High." PX 195 at DTP 3239, PX 445, 446; TR 518–19.

On December 13, 2000, Tillinghast projected the claims against Anchor as: $163.4 million "Low;" $293.9 million "Medium;" and $325.6 million "High." PX 294 at COLTEC 010957; PX 295 at COLTEC 010956; PX 445; TX 4 at ¶¶ 5, 8; TR 521. Garlock and Anchor combined estimated gross future liabilities increased in the "Low" category from $1.202 billion to $1.985 billion, in the "Medium" category from $1.598 billion to $2.619 billion, and in the "High" category from $2.234 billion to $3.091 billion. PX 445, 446.

In December 2000, Tillinghast performed another set of estimates of the gross future asbestos liabilities of Garlock and Anchor using substantially the same methodology as in 1996. PX 294–95, 445–47; TX 4; TX 5 at ¶¶ 21–26; TR 521–22, 604–05, 616–21. Tillinghast estimated Garlock's gross future liabilities increased in the "Low" category from $990 million to $1.821 billion, in the "Medium" category from $1.321 billion to $2.325 billion, and in the "High" category from $1.540 billion to $2.765 billion. PX 295 at COLTEC 01954; PX 445; TX 4 at ¶¶ 5, 8.

with enforcing the note in case of default. JX 28 at COLT 22445. The Stemco Note and Garlock Note were issued contemporaneously. DX 685; PX 97; TR 260, 262–63.

On August 27, 1996, Garrison's charter was amended to authorize issuance of 300,000 shares of common stock and 1,500,000 shares of Class A stock. PX 97 at COLT 18394; TR 260–62. On September 13, 1996, pursuant to a Stock Purchase Agreement, Coltec contributed $998,000 to Garrison in exchange for 99,800 shares of Garrison common stock ($10 per share) and $13,000,000 to Garrison in exchange for 1,300,000 shares of Garrison Class A stock ($10 per share). JX 34; PX 97 at COLT 18547–51. The Class A stock was the same as the common stock, except it was entitled to a liquidated preference at $10 per share. JX 34; PX 97 at COLT 18547–51.

Garlock contributed to Garrison: the $375 million Stemco Note; all of the outstanding stock of Anchor; the rights to any future asbestos insurance recoveries; furniture, fixtures, and equipment; and all of the files, records, and data of the Asbestos Litigation Department. JX 33; PX 77. In exchange, Garrison issued 100,000 shares of Garrison common stock to Garlock and assumed defense and payment of Garlock's and Anchor's contingent asbestos liabilities. JX 41; PX 83, PX 97 at COLT 18443–77, 18553–54, PX 452; TR 263–64, 268–71, 708, 728. Garrison retained all twelve of the Asbestos Litigation Department personnel and entered into agreements to manage, defend, and administer any asbestos claims brought against Anchor or Coltec. JX 35, 38, 86; PX 97 at COLT 18483–518; TR 707–09. Under this agreement, Garrison also agreed to indemnify Garlock for uninsured asbestos liability, but Garrison did not indemnify Anchor. PX 88, 97; JX 36 at ¶ 1.6. Garrison, however, became Anchor's parent corporation. JX 36; PX 97 at COLT 18443–73. A separate Management Services Agreement was entered into between Garrison and Anchor, however, Garrison and Garlock also entered into reciprocal credit arrangements to invest Garrison's excess cash or to make interim loans to cover Garrison's cash needs. PX 84, 97 at COLT 18528–45; PX 425; JX 32, 39; TR 273–77, 1173–77, 1195–1208. In addition,

Garrison established its own bank accounts so it could process and settle claims independently. TR 708–13, 1186–87. Leases for the Asbestos Litigation Department's facilities also were assigned from Coltec to Garrison. JX 37; TR 708.

On September 13, 1996, Garrison commenced operations with O'Reilly serving as President. TR 631, 707–09, 772. In November 1996, a Director of Finance was hired to establish a separate accounting department and all insurance reimbursement billing was brought in-house. TR 711–17, 1148–49, 1183–86, 1195–1208. Since that time, Garrison actively has managed all aspects of the asbestos litigation against Garlock and Anchor. TR 707–09, 772. O'Reilly's annual bonus of $150,000–$200,000 was billed separately to insurance carriers. TR 664–65, 713. On September 13, 1996, Garrison had $15 million of cash on hand; thereafter, Garrison lost more than $80 million and, as of January 31, 2004, had a negative balance of $67.5 million. PX 425; TR 1209–10; A–TR 178–79; see also Eric Hellerman, "The Asbestos Litigation Crisis: Who Will Clean Up This Elephantine Mess?" Washington Legal Foundation Working Paper Series No. 114 (March 2003).

## F. Garlock Initially Sold Garrison Stock Only To The Banks.

In October 1996, shortly after the establishment of Garrison, the Coltec Group began efforts to sell the 100,000 shares of Garrison common stock owned by Garlock to sophisticated investors or financial institutions to establish a market price. PX 99, 119, 129, 142; DX 210 at AA 20000; DX 322 at AA 15051; TR 254, 279–81, 405–06, 445. Coltec was concerned that if it first sold Garrison stock to service providers, the sale could be characterized as fee compensation. TR 405–06; see also 26 U.S.C. § 83(a).

Andolino personally contacted at least seven prospective sophisticated investors with an offer to sell Garlock's shares in Garrison for $1.1 million or $11 per share. PX 99, 119, 129, 142; JX 43; TR 281–82, 305–06. A term sheet explained that the purchase of Garrison stock was an extremely speculative investment, but that Coltec was willing to

negotiate unspecified "appropriate exit strategies," since there was no public market for the shares. JX 43 at G15195.

In August 1996, Coltec moved its corporate headquarters to Charlotte, North Carolina, which also was the headquarters of NationsBank and First Union (hereinafter collectively "the Banks"). TR 1042, 1056–60, 1477–81; JX 30. In October 1996, Andolino contacted First Union about making an investment in Garrison. JX 74; TR 1479. First Union was eager to develop a relationship with Coltec, but initially was not interested in purchasing Garrison stock as an investment. TR 1479, 1481, 1483. First Union reconsidered after Coltec agreed to pay for First Union's due diligence costs. DX 121; TR 1477–78, 1481–83. Late in the fall of 1996, First Union also joined a group of lenders that provided financing to Coltec and earned substantial income from that relationship. JX 70; PX 155; TR 1484–85.

In October 1996, Coltec's CFO also contacted NationsBank. TR 1051, 1480. NationsBank initially rejected the opportunity to invest in Garrison. TR 1052–56. Coltec's CFO contacted NationsBank again and asked NationsBank to reconsider, indicating that First Union was considering making a purchase of Garrison stock. JX 49; JX 51; TR 1052–57. NationsBank reconsidered, viewing this investment as a way to improve its business relationship with Coltec. JX 51; TR 1056–62. Several days later, NationsBank "[c]alled John Guffey and told him that we would proceed with the investment. [We] told him that we were doing this for relationship reasons, not just investment reasons, and expected to be 'at the table' as a player in their financing picture going forward." JX 51; see also TR 1052–61. NationsBank subsequently also earned substantial income through its relationship with Coltec. JX 54, 68, 71; TR 1049–51.

Thereafter, the Banks undertook due diligence jointly. JX 52, 58; PX 143; TR 307–09, 1485–88, 2575–76. KPMG Peat Marwick ("KPMG") and Stewart Economics, Inc. ("Stewart") were retained to analyze the Tillinghast Report and July 1996 Kahn Report. JX 42–63, 116–17; TR 513–23, 1485–86, 1545–46, 1575–77, 1602–03.

On December 3, 1996, Garlock provided a draft Confidential Offering Memorandum to the Banks that discussed the high risk nature of the investment, emphasizing the fact that best estimates of asbestos claims in the past had been underestimated. PX 136 at COLT 17129–50; JX 73 at C273, C278–79, C289; TR 1077–78, 1526–29, 2577–78; see also JX 50 at BOA 0832; JX 67 at 2. An exit strategy was set forth in a separate Shareholders Agreement wherein the Banks were granted the right to "put" the Garrison shares to Coltec at fair market value [5] and Coltec had the right to "call" or buy back the shares at a fixed price; each option right was executable after five years.[6] JX 75 at §§ 3.1, 3.2(a), 3.3, 3.4; TR 286–91, 322–23, 1520–21, 2203–04.

Stewart issued an opinion on December 12, 1996 concluding that the Kahn Report was based on reasonable methods, but characterized Kahn's insurance recovery estimates as "best-case." JX 64 at BA 965. Therefore, the Banks established separate subsidiaries to insulate their banking business from any potential veil-piercing claims. TR 316, 319–20, 1067, 1501–02, 1517–18, 2586–87. NationsBank's subsidiary was GLM Investments, Inc.; First Union's subsidiary was 1005 Corp. JX 77–78; TR 319, 1067. On December 20, 1996, each of the Banks' subsidiaries separately entered into a Stock Purchase Agreement with Garlock, under which each purchased 50,000 shares of Garrison common stock for $250,000 or 100,000 shares for a total of $500,000 or $5 per share equaling a 6.67% minority block of stock. JX 66, 72–73, 75–76; PX 162, PX 163 at G 16515–27, PX

---

5. A "put" is "an option to sell at a specific price within a specified time limit." HERBERT FILER, UNDERSTANDING PUT AND CALL OPTIONS 9 (9th ed.1972) ("FILER"). In this case, the put price depended on the financial condition of Garrison at the time and a formula employed to determine the fair market value of the stock. JX 73 at C273, C276–77; TR 287–88.

6. A "call" option is "a contract, paid for when it is purchased, which gives the holder the right to buy, at his option, a specified number of shares of a stated stock at a fixed price, on or before a fixed date." FILER, at 57.

167; TR 318–20. In return, Coltec agreed to indemnify the Banks for any asbestos related claims that may arise in the future. JX 75 at § 5.5; TR 316–18, 1488–89, 1518, 2589–90. Coltec and the Banks also executed a contemporaneous Confidentiality Agreement. JX 75 at § 4.1; TR 1519. And, the Banks required and obtained an opinion from counsel that both the Stemco Note and Garlock Note were enforceable. JX 60 at COLTEC 2248; JX 62 at COLTEC 5146; PX 134, 163 at G 16582–16587; TR 2597–98.[7]

As of this date, the Banks have not exercised their put rights and Coltec has not exercised its call options. TR 304–05, 1521, 1530, 2612–13. Both set of options have now expired.

### G. In October 1998, 3% Of Garrison Stock Was Sold To Lead Regional Defense Counsel.

After the sale of Garrison stock to the Banks closed, Coltec directed its efforts to sell Garrison stock to a select group of lawyers involved in defending asbestos claims. PX 189; TR 724. Fifteen attorneys, ranked by annual billings, were invited to purchase stock at a June 5, 1997 meeting convened by O'Reilly and Andolino, at which time the formation of Garrison and opportunity to purchase Garrison stock was discussed. DX 222; JX 82–83, 88–90, 96; PX 412; TR 724–31, 820–21, 830–46, 1393–94. Afterwards, a meeting was convened at the offices of Kronish Lieb to discuss concerns raised by some of the defense counsel about the proposal and to begin working on the requisite paperwork. JX 92; PX 192–93; TR 733–34. Eventually, Coltec decided to reduce the exercise price on the call option to $15.25 per share. DX 1084 at 3, 18–22; DX 1000; DX 1010 at 5, 27–30.

In October 1998, Coltec sold 45,000 shares or 3% of its Garrison stock at $5 per share to lead attorneys in four regional defense firms. JX 99, 104; PX 225, 231–38; TR 731–34, 742–48, 832–33. The attorneys also were provided with a Stock Purchase Agreement, a Shareholders Agreement, and a Confidential Offering Memorandum similar to that used with the Banks. JX 95, 99, 100–03, 104, 105–07; PX 225, 230, 232, 234, 237–38; TR 742–48. The amount the attorneys might gain from the investment, however, was small in comparison to the legal fees they expected to earn during the period they held the shares. DX 1000 at GOV 231–33. Their put options opened in August 2003, but were never exercised. TR 771–72.

Although the parties spent a fair amount of time at trial on this transaction, the sale of Garrison stock to Coltec's lead regional defense counsel took place almost two years after the formation of Garrison. Therefore, the court considers this event to be irrelevant to the statutory issues concerning the formation of Garrison and sale of Garrison stock to the Banks. Accordingly, no further discussion of this event is necessary other than this background.

### H. In January 1999, The Coltec Group Was Acquired By The B.F. Goodrich Corporation.

In January 1999, the Coltec Group was acquired by the B.F. Goodrich Corporation for approximately $2.5 billion. TR 136, 341, 632; A–TR 87–88. In 2002, Anchor, Garlock, Garrison, and Stemco were spun off into a new entity called EnPro Industries, Inc. TR 136, 632.

## PROCEDURAL BACKGROUND

### A. Administrative Proceedings At The Internal Revenue Service.

#### 1. The Coltec Group's Consolidated Federal Income Tax Return For The Tax Year Ending December 31, 1996.

On September 15, 1997, the Coltec Group filed a consolidated federal income tax return for the tax year ending December 31, 1996. JX 85 at GX 24406–07; TX 1A at ¶¶ 1–2. On August 10, 2000, following an Internal Revenue Service ("IRS") examination of that re-

---

7. KPMG's post closing January 21, 1997 Report also concluded that the Tillinghast Report was based on reasonable methods and took into account an upward surge in filings in 1995 and 1996, but warned that future trends were impossible to predict with certainty. PX 145 at BA 1049–50, 1053; PX 150 at BOA 814–15, 818.

turn, the Coltec Group executed a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) in the amount of $82,708,152. PX 291; TX 1A at ¶¶ 3–5.

### 2. The Coltec Group's Deficiency And Assessment.

The IRS assessed the Coltec Group the full amount of the deficiency, $82,708,152, for the tax year ended December 31, 1996. The Coltec Group paid the full amount of the assessment through the following payments or refunds on the following dates:

| (CREDITED or REFUNDED) DATE PAID | (CREDITED or REFUNDED) AMOUNT PAID |
| --- | --- |
| April 15, 1996 | $ 3,853,065 |
| April 15, 1996 | $ 4,800,000 |
| June 17, 1996 | $ 9,000,000 |
| December 16, 1996 | $ 3,000,000 |
| March 7, 1997 | ($15,000,000) |
| March 17, 1997 | $ 64,531 |
| April 15, 1997 | ($ 5,453,522) |
| August 10, 2000 | $22,708,152 |
| August 11, 2000 | $60,000,000 |
| August 21, 2000 | ($ 264,074) |
| Total: | $82,708,152 |

PX 177; TX 1A at ¶¶ 6–8.

### 3. The Coltec Group's Claim For A Federal Income Tax Refund.

On August 18, 2000, Coltec timely filed a federal income tax refund claim for $82,803,049 for the tax year ending December 31, 1996. PX 33, 177; TX 1A at ¶¶ 7–11. On January 31, 2001, however, the IRS disallowed the refund. JX 111; TX 1A at ¶¶ 12–13.

### B. Proceedings In The United States Court Of Federal Claims.

On February 13, 2001, Coltec timely filed a complaint in the United States Court of Federal Claims for a federal income tax refund. TX 1A at ¶ 14. Initially, this case was assigned to the Honorable Lawrence M. Baskir, then serving as the Chief Judge of the United States Court of Federal Claims. The Government filed an answer on May 30, 2001. Fact and expert discovery commenced on August 5, 2002.

Count 1 of Coltec's complaint seeks a research tax credit of $8,103,324 against its 1993 federal income tax liability, resulting from alleged qualified research expenses incurred during the tax years 1992, 1993, and 1994, and carried forward and back to the 1993 tax year. Compl. ¶¶ 9–19. Coltec seeks a refund of $6,662,099 for the 1993 tax year for this credit. Compl. ¶ 8. Count 2 also seeks a $1,221,676 research tax credit and refund against Coltec's 1994 federal income tax returns. Compl. ¶¶ 20–25. On June 11, 2003, Judge Baskir granted Coltec's motion to bifurcate the research credit claims for 1993 and 1994 and stayed the proceedings on those claims to allow the refund associated with the Garrison transaction to proceed to trial. On August 15, 2003, this case was reassigned to the undersigned judge.

On January 30, 2004, discovery concluded. On March 3, 2004, Coltec filed a Pre–Trial Brief. On April 2, 2004, the Government filed a Pre–Trial Memorandum of Contentions of Fact and Law ("Gov't Pre–Trial Memorandum").

A trial was held in Washington, D.C., on May 3–7, 10–14, and 17–18, 2004, during which the court heard testimony from twenty-nine witnesses.[8] During trial, the Govern-

---

8. Coltec's three fact witnesses were: John W. Guffey, Jr., former Coltec President and CEO; Joseph Andolino, former Coltec Vice President of Taxation; and Timothy O'Reilly, former President of Garrison. Coltec's expert witnesses were: Michael Angelina, co-author of the Tillinghast Report; and Joseph Kahn, author of the Kahn Report. On rebuttal, Coltec proffered the following expert witnesses: Linda Barber, Partner at Navigant Consulting; Dr. Kenneth R. Cone, Senior Vice President of Lexecon, Inc.; Stephen Sherman, Co–National Leader of Valuation Services for KPMG, LLP; and Dr. Seymour Jones, Clinical Professor of Accounting, Stern School of Business, New York University. In addition, Robert W. Long, former Assistant General Counsel at NationsBank, testified as a fact witness during Coltec's rebuttal case.

The Government's fact witnesses included: Chris Sauvigne, former Arthur Andersen partner; Michael D. Gisby, an Arthur Andersen senior associate assigned to the Coltec account in 1996; Gregory W. Powell, former NationsBank Senior Vice President; Thomas W. McClay, Arthur Andersen senior associate assigned to the Coltec Group account in 1996; Thomas B. Jones, former Coltec Group Assistant Treasurer; Andrew Giller, former Vice President of Finance for Garrison Litigation Management Group; Jeffrey Hicks, former Coltec Group in-house tax attor-

ment asked the court to reconsider a May 14, 2003 Privilege Order issued by Judge Baskir ("Privilege Order"), which allowed thirty-nine documents containing "risk assessment and legal analysis of the proposed transaction to be redacted." In light of extensive evidence proffered at trial regarding Coltec's concerns about "veil piercing" and the extent of contingent asbestos liabilities faced by Garlock and Anchor, the court decided to require Coltec to produce documents containing "risk assessment" information and Coltec complied. DX 214. The court indicated that it would not revisit Judge Baskir's well reasoned decision on privilege grounds, but would allow the Government the opportunity to brief this issue further after trial, even though the Government did not file a motion for reconsideration at the time the Privilege Order was entered. Having reconsidered the Government's position, the court denies the Government's request to have the thirty-nine documents at issue produced and concurs with Judge Baskir's prior ruling that those documents are subject to the attorney work-product privilege.

On August 6, 2004, the parties filed redacted trial exhibits. On August 13, 2004, Coltec filed Post–Trial Proposed Findings of Fact and Conclusions of Law. On August 16, 2004, the Government filed Post–Trial Proposed Findings of Fact and Conclusions of Law. On August 30, 2004, Coltec filed a Post–Trial Brief ("Coltec Post–Trial Brief"), and the Government filed a Post–Trial Memorandum ("Gov't Post–Trial Memorandum").

On September 29, 2004, the court entertained a five and one-half hour oral argument by the parties to address issues arising from post trial briefs and respond to issues raised by the court. On October 4, 2004, at the request of the court, the parties submitted a flow chart depicting their legal argument, together with additional research. The court also allowed further submissions by counsel on October 6, 2004 and October 12, 2004.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded upon . . . any act of Congress or any regulation of an executive department[.]" 28 U.S.C. § 1491. *See New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1558 (Fed. Cir.1997) (reaffirming the jurisdiction of the United States Court of Claims over a suit concerning a federal tax refund). Coltec also has met all other jurisdictional requirements.

Pursuant to 26 U.S.C. § 7422(a) no claim for a refund may be filed for the recovery of any internal revenue tax until a claim has been filed with the IRS. Coltec filed its claim for a refund of $82,803,049 on August 18, 2000. PX 33; TX 1A at ¶¶ 10–16. In addition, on December 31, 1996, Coltec paid the tax amount in dispute, as required by 26 U.S.C. § 6511(a). TX 1A at ¶ 6. On February 13, 2001, Coltec filed a complaint in the United States Court of Federal Claims, within two years from the date the IRS notified Coltec of the disallowance and well within the six year statute of limitations, set forth in 28 U.S.C. § 2501. TX 1A at ¶ 14.

### B. Standard Of Review.

In a tax refund suit the taxpayer has the burden of proof. *See Niles Bement Pond Co. v. United States,* 281 U.S. 357, 361, 50 S.Ct.

ney; Paul Capiello, former Coltec Group Director of Tax Analysis; Robert J. Tubbs, former Coltec Group General Counsel; William F. Mahoney, shareholder in the law firm of Segal, McCambridge, Singer, and Mahoney; David L. Wedding, former Arthur Andersen partner; David Trotter, former First Union Relationship Manager; Daniel Lee Rourke, former KPMG employee who analyzed the Tillinghast Report for the Banks; Frederic Goldfein, law partner in the firm of Goldfein and Joseph and former Northeast Regional Counsel for Garrison.

In addition, the Government proffered the following expert witnesses: Gayle Koch, Director, Head of Environmental/Mass Tort Practice, The Brattle Group; Dr. A. Lawrence Kolbe, Principal and Director of the Brattle Group; Dr. Raymond Ball, Sidney Davidson Professor of Accounting, Graduate School of Business, University of Chicago; Dr. Robert McDonald, Erwin P. Nemmers Distinguished Professor of Finance at the Kellogg Graduate School of Management, Northwestern University; and Rees Morrison, shareholder in the legal consulting firm of Hildebrandt International. Ms. Koch and Dr. Kolbe also were recalled during the Government's surrebuttal.

251 (1930). Where liabilities are assumed, "the burden is on the taxpayer to prove such assumption . . . is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence." 26 U.S.C. § 357(b)(2); *see also* Treas. Regs. § 1.357–1(c)(equating "clear preponderance" with "unmistakable" proof).

## C. Relevant Statutory Provisions.[9]

### 1. The Requirements Of An Exchange Pursuant To 26 U.S.C. § 351.

Congress has determined that a controlled corporation's issuance of property for stock does not occasion immediate recognition of gain or loss. *Compare* 26 U.S.C. § 1001(a) ("Section 1001(a)") [10] *with* 26 U.S.C. § 351(a) ("Section 351(a)").[11] And, Congress has "permitted deferment of such tax liability through the provisions of [Section 351(a)] . . . in cases in which the taxpayer transfers property to a corporation solely in exchange for stock if, immediately following the transaction, [the taxpayer] controls the transferre[d] corporation." *Campbell v. Wheeler*, 342 F.2d 837, 838 (5th Cir.1965); *see also* BITTKER & EUSTICE ¶ 3.01 (quoting *Portland Oil Co. v. Commissioner*, 109 F.2d 479, 488 (1st Cir.1940), *cert. denied*, 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416 (1940)) ("[Section 351 delays a taxpayer's recognition of] gain

or loss [that] may have accrued in a constitutional sense, but where in . . . economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out on a venture[.]"). Even if the transferor pre-planned a prompt disposition of the transferor's stock, as happened in this case, Section 351(a) is still applicable if the immediate "control" requirement is satisfied. *See* GINSBURG & LEVIN ¶ 901.

### 2. The Treatment Of Assumed Liabilities In A 26 U.S.C. § 351 Exchange.

Congress also has determined that the tax deferred benefits of Section 351 are preserved, even where a transferee assumes a transferor's liabilities. *See* 26 U.S.C. § 357(a).[12] The general rule found in Section 357(a) provides that "the transferee corporation's assumption of liabilities is not treated as money or other property. The transferor's gain is recognized only if money or other property is exchanged." 26 U.S.C. § 357(a). Specifically, Section 357(a) applies to "liabilities" in existence before the time when the Section 351 exchange occurred, such as "mortgages, trade obligations, bank loans, customers' deposits, and the like arising from the ordinary course of business; and this should be true even though the transferor, at the time of the § 351 exchange, is able to pay such obligations himself but chooses instead to have the transferee corporation assume, or

---

9. The court found both parties' exposition of the relationship between relevant statutory provisions of the Internal Revenue Code ("Code") to be less than satisfactory. Therefore, the court frequently consulted, liberally has paraphrased, and deeply is indebted to the instruction and scholarship of: MARTIN D. GINSBURG AND JACK S. LEVIN, MERGERS, ACQUISITIONS, AND BUYOUTS: A TRANSACTIONAL ANALYSIS OF THE GOVERNING TAX, LEGAL, AND ACCOUNTING CONSIDERATIONS (Dec.2003) ( "GINSBURG & LEVIN") and BORIS I. BITTKER AND JAMES S. EUSTICE, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS (7th ed.2002) ("BITTKER & EUSTICE").

10. Section 1001(a) provides:
   Computation of gain or loss.—The gain from the sale or other disposition of property shall be the excess of the amount [of gain] realized therefrom over the adjusted basis provided in *section 1011* for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

26 U.S.C. § 1001(a).

11. Section 351(a) provides that "the transferor shall recognize no gain or loss if property is transferred to a corporation solely in exchange for its stock; and if the transferor or transferors control the corporation immediately after the exchange." 26 U.S.C. § 351(a).

12. Section 357(a) provides that if:
   (1) the taxpayer receives property which would be permitted to be received under Section 351 . . . without the recognition of gain if it were the sole consideration, and (2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability, then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351[.]

26 U.S.C. § 357(a).

take property subject to, the obligations." BITTKER & EUSTICE § 3.06[3].

The assumption of liabilities, however, may trigger Section 358(d)(1) [13] requiring any assumption of liabilities to be treated as money, but there are two important exceptions: 26 U.S.C. § 357(b) ("Section 357(b)") and 26 U.S.C. § 357(c)(1) ("Section 357(c)(1)").

### a. The Effect Of 26 U.S.C. § 357(b).

Section 358(d)(1) does not apply where "taking into consideration the *nature of the liability* and the circumstances in the light of which the arrangement for the assumption ... was made, it appears that the *principal purpose of the taxpayer* ... was a purpose to avoid Federal income tax on the exchange, or ... if not such purpose, was not a *bona fide* business purpose." 26 U.S.C. § 357(b) (emphasis added).[14] If the taxpayer cannot satisfy the requirements of Section 357(b) by a "clear preponderance of the evidence," then the assumption of liabilities will be treated as money or "boot," and the taxpayer is required to recognize any gain up to the full amount of the liability. *See* 26 U.S.C. § 357(b)(1).

13. Section 358(d)(1), provides:

> Where, as part of the consideration to the taxpayer, another party to the exchange assumed a liability of the taxpayer ..., such assumption ... shall, for purposes of this section, be treated as money received by the taxpayer on the exchange.
> 26 U.S.C. § 358(d)(1).

14. Section 357(b) provides:

> (1) In general.—If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption ... was made, it appears that the principal purpose of the taxpayer with respect to the assumption ... described in subsection (a)—
> (A) was a purpose to avoid Federal income tax on the exchange, or
> (B) if not such purpose, was not a bona fide business purpose, then such assumption ... (in the total amount of the liability assumed ... pursuant to such exchange) shall, for purposes of section 351 or 361 (as the case may be), be considered as money received by the taxpayer on the exchange.
> (2) Burden of proof.—If any suit or proceeding where the burden is on the taxpayer to prove such assumption ... is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

### b. The Effect Of 26 U.S.C. § 357(c)(1).

Section 358(d)(1) also will not apply and any gain will be recognized "if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange[.]" 26 U.S.C. § 357(c)(1).[15] Where the amount of liabilities transferred is greater than the basis of transferred property, then the transferor recognizes gain on the amount by which the liability exceeds the basis of the transferred property. *Id.*

Section 357(c)(3)(A)(i),[16] however, excludes liabilities from consideration under Section 357(c)(1), *i.e.*, if payment would give rise to a deduction under 26 U.S.C. § 162(a) ("Section 162(a)").[17] If a liability is excluded under Section 357(c)(3)(A)(i), it also is excluded from 26 U.S.C. § 358(d)(1).

### 3. 26 U.S.C. Section 358(a)(1) Determines Basis In A Section 351 Exchange.

As a general matter, an asset's basis is equal to its cost. *See* 26 U.S.C. § 1012

26 U.S.C. § 357(b).

15. Section 357(c)(1) provides:

> if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.
> 26 U.S.C. § 357(c)(1).

16. Section 357(c)(3)(A)(i) provides:

> If a taxpayer transfers, in an exchange to which Section 351 applies, a liability the payment of which either—
> (i) would give rise to a deduction, ... then, for purposes of paragraph (1), the amount of such liability shall be excluded in determining the amount of liabilities assumed or to which the property transferred is subject.
> 26 U.S.C. § 357(c)(3)(A)(i).

17. Section 162(a) provides:

> There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]
> 26 U.S.C. § 162(a).

("Section 1012").[18] Congress has determined that the transferor's basis in stock received from a Section 351 exchange is the same as the transferor's basis in the property conveyed in exchange for the transferee's stock. *See* 26 U.S.C. § 358(a)(1).[19] If a transferor receives money or "boot" during a Section 351 exchange, however, the basis in stock received by the transferor is the same as the basis of the property exchanged, minus the fair market value of the boot received plus gain recognized by the transferor. *See* 26 U.S.C. § 358(a)(1).

### D. The Coltec Group's Argument.

Coltec made three core arguments that are summarized here. *See* Coltec Post–Trial Brief at 2–35. The court requested that Coltec reduce its statutory argument into a "flow chart," which is attached hereto as Appendix A.

### 1. Federal Tax Law Does Not Require That Garlock's Basis In Garrison Stock Be Reduced By The Contingent Asbestos Liabilities That Garrison Assumed.

Coltec claims that Garlock's contribution of Anchor's stock and the Stemco promissory note to Garrison was qualified property under Section 351 and therefore Garlock recognized no gain or loss on the exchange. Coltec's Post–Trial Brief at 2. Garlock's basis in the Garrison stock received therefore is asserted to be the same as Garlock's basis in the Anchor stock and the Stemco promissory note, pursuant to Section 358(a)(1) and (d)(2), about which the court is advised "[t]here is no dispute." *Id.*

Next, Coltec asserts that no reduction in Garlock's basis is required because of Garri-

son's assumption of Garlock's contingent asbestos liabilities, since they are not "liabilities" under either Section 357 or Section 358(d). *Id.* at 3. This is so because those liabilities would have been deductible by Garlock, if they were paid prior to the Section 351 exchange and, therefore, pursuant to Section 358(d)(2), do not reduce Garlock's basis in Garrison stock. *Id.* at 3–5.

In the alternative, Coltec argues that even if Garlock's contingent asbestos liabilities were liabilities under Section 358(d), that section of the Code does not require the reduction of Garlock's basis in Garrison stock by the amount of the asbestos liabilities. Thus, Coltec insists the only effect Section 357(b) can have is to increase Garlock's basis, if the principal purpose for the assumption of liabilities was to avoid the tax on the exchange or the assumption had no *bona fide* business purpose. *Id.* at 6–7. Thus, Coltec points out that Section 358(d)(2) and Section 357(c)(3)(A) specifically exempt Garlock's asbestos liabilities from the reach of Section 358(a)(1). *Id.* at 9–12. Thus, since Section 357(c)(3)(A) refers to liabilities that would have been deductible if paid by Garlock prior to the Section 351 exchange, the obligation to pay for those liabilities after the exchange was assumed by Garrison. *Id.* at 11. Therefore, Coltec urges the court to reject the Government's interpretation of Section 358(d)(2) to require liabilities to be deducted and reduce the basis in stock because Section 358(d)(2) speaks of liabilities that would be deductible by the transferor, but only if they were paid prior to the transfer. *Id.* at 11–12.

On this issue, Coltec concludes that Garlock's basis in the Garrison stock must be calculated under Section 358(a) to include Garlock's basis in the Stemco promissory

---

18. Section 1012 provides: "The basis of property shall be the cost of such property[.]" 26 U.S.C. § 1012.

19. Section 358(a)(1) provides:
    in the case of an exchange to which Section 351 applies: The basis of the property permitted to be received under [Section 351] without the recognition of gain or loss shall be the same as that of the property exchanged—
    (A) decreased by—
    (i) the fair market value of any other property (except money) received by the taxpayer,

(ii) the amount of any money received by the taxpayer, and
(iii) the amount of loss to the taxpayer which was recognized on such exchange, and
(B) increased by—
(i) the amount which was treated as a dividend, and
(ii) the amount of gain to the taxpayer which was recognized on such exchange (not including any portion of such gain which was treated as a dividend).
26 U.S.C. § 358(a)(1).

note and in Anchor's stock. *Id.* at 13. Although the Government claims that Garlock's basis in the Garrison stock was inflated, Coltec counters that, even if that were true, the Government's argument is irrelevant. *Id.* at 13–14.

### 2. Garlock's Transfer Of Garrison Stock To The Banks Was A Sale.

Next, Coltec argues that Garlock's sale of Garrison stock to the Banks should be respected if "the legal form chosen would affect the economic interests of the parties." *Id.* at 15. At trial, the Government proffered expert testimony that characterized Coltec's transaction with the Banks as a "constructive non-sale." Coltec dismisses that theory because of the reality that the Banks continue to own Garrison stock and the put and call options were never exercised and are now expired. *Id.* at 17–18. Moreover, Coltec countered "tax law does not recognize the concept of a 'constructive non-sale.'" *Id.* at 19. As for the Government's argument that the Banks acquired a "hybrid security," Coltec argues, even if true, that fact is irrelevant for purposes of how the tax law treats the transaction with the Banks. *Id.* at 20.

### 3. No Judicial Doctrine Disallows Garlock's Loss On The Sale Of Garrison Stock To The Banks.

Coltec claims that the sale of Garrison stock to the Banks did not require a separate non-tax business purpose for the loss to be deductible and that the tax loss claimed by Garlock resulted from a real economic loss suffered in its "historic business." *Id.* at 23–24. The fact that the Banks were viewed as "friendly" buyers that purchased the Garrison stock to improve their relationship with Coltec is irrelevant with regard to the tax consequences to Garlock. *Id.* at 24–25.

Thus, Coltec concludes that the "Garrison transactions were not a sham. They had non-tax business purposes and advantages. And they had economic substance ... because they permanently changed the parties' economic positions, legal relations, and non-tax business interests, and created genuine, enforceable obligations to the third-party Banks." *Coltec Post–Trial Brief* at 25–26;

*see also id.* at 32. The key distinction between the "sham" cases, cited by the Government, is that the Garrison transaction was not transitory and had a legitimate business purpose, *i.e.,* to isolate and further insulate the asbestos litigation activities from Coltec's core business and to streamline and better manage asbestos litigation activities and facilitate settlements. *Id.* at 29–30.

### E. The Government's Counter–Arguments.

The Government's counter-arguments also are set forth here in summary form. *See* Gov't Post–Trial Memorandum at 6–40. The court also requested that the Government reduce its statutory argument into a "flow chart," which is attached hereto as Appendix B, together with the Government's depiction of the relevance of the "economic substance" doctrine.

### 1. Garrison's Assumption Of Garlock's Asbestos Liabilities Reduces Garlock's Basis In Garrison Stock.

First, the Government argues that Garrison's assumption of asbestos liabilities reduced Garlock's basis in Garrison stock under Section 358(d)(1). Gov't Post–Trial Memorandum at 9–12; *see also id.* at 12–14; A–TR 67. If the asbestos liabilities at issue are not liabilities under the Code, *ipso facto,* the Government concludes that they must be "other property," and therefore Garlock's basis in the Garrison stock would have to be reduced by its "fair market value" under Section 358(a)(1)(A)(i). Gov't Post–Trial Memorandum at 13. The Government, however, concedes that since the asbestos liabilities in this case are "(as their name implies) 'liabilities' ... the Court will need to address Coltec's other attempts at evading the general rule that liability assumptions reduce basis, just like any other money or other property received." *Id.* at 14.

Therefore, the Government contends that Coltec failed to satisfy the requirements of Section 357(c)(3) and may not invoke Section 358(d)(2). *Id.* at 15. Coltec's failure to qualify for a Section 357(c)(3) exemption is premised on the Government's position that " 'the principal purpose' with respect to Garrison's

assumption of the asbestos liabilities was not a *bona fide* non-tax business purpose." *Id.* at 16; *see also id.* at 16–23. In addition, the Government argues that Coltec failed to demonstrate that the asbestos liabilities "would give rise to a deduction" within the meaning of Section 357(c)(3)(A)(i), and therefore Coltec is not entitled to Section 358(d)(2) relief. *Id.* at 23–34. For these reasons, Garlock's basis in the Garrison stock should be reduced by $371.2 million, the amount of Garlock liabilities assumed by Garrison.

### 2. The Coltec Group Failed To Prove That Garlock's Transfer Of Garrison Stock To The Banks Was A Sale.

Coltec claims that it recognized a loss of approximately $370 million from the sale of Garrison stock to the Banks under Section 1001(a). *Id.* at 34–35. The Government, however, contends that the "key to determining whether a particular transaction is properly characterized as a sale is [the] determination of whether the benefits and burden of ownership have passed from the seller to the buyer." Gov't Post–Trial Memorandum at 35. Since the put and call options included in the Shareholders Agreement "had the effect of negating any transfer of beneficial ownership of the Garrison shares, [therefore,] no sale ... occurred." *Id.* at 37; A–TR 69.

### 3. The Coltec Group Failed To Prove That The Transactions Had Economic Substance.

Finally, even if Coltec met all the requirements of the Code, the Government urges the court to apply the "economic substance" doctrine in this case to invalidate the benefits the taxpayer achieved. Gov't Post–Trial Memorandum at 37; A–TR 69, 76. The doctrine has two components: "(1) a subjective inquiry into whether the transaction was carried out for a valid business purpose; and (2) an objective inquiry into the objective economic effect of the transaction." Gov't Post–Trial Memorandum at 38. Coltec is claimed

to have failed the subjective part of the economic substance doctrine because the "[t]ransactions were the product of a tax avoidance strategy conceived by [Arthur] Andersen and Coltec's tax department to shelter the capital gain from the sale of Holley [Automotive]." *Id.* at 38. In addition, the Government concludes that the transfer of Garrison stock to the Banks failed the objective inquiry and "was illusory because Coltec had transferred only bare legal title—not the incidents of ownership." *Id.* at 39.

### F. The Court's Resolution Of Issues Concerning Statutory Interpretation.

#### 1. The Formation Of Garrison Satisfied Each Of The Requirements Of Section 351.

#### a. Coltec And Garlock Transferred Qualifying "Property" To Garrison.

The United States Supreme Court has instructed the lower courts that property is determined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). On September 13, 1996, Coltec transferred $14 million in cash to Garrison. In addition, Garlock transferred to Garrison: 100% of Anchor stock, with a basis of $4,206,091; any potential future payments from Anchor's insurance coverage; and a $375 million promissory note issued by Stemco to Garlock. Anchor's stock, any potential payments from Anchor's insurance coverage, and Coltec's $13,998,000 cash contribution, are all traditional recognized forms of property.[20]

The Stemco promissory note provides "for all purposes [it] shall be governed by and construed in accordance with the laws of [New York]." JX 27 at G 14819. New York state courts recognize a promissory note as property. *See, e.g., Lippes v. Atlantic Bank of New York,* 69 A.D.2d 127, 419 N.Y.S.2d

---

**20.** Property is not defined in the Internal Revenue Code, but stock, cash, and certain debt instruments have been treated as qualifying for tax-free treatment. *See, e.g., Peracchi v. Commissioner,* 143 F.3d 487, 489 (9th Cir.1998) ("Corporations may be funded with any kind of asset, such as equipment, real estate, intellectual property, contracts, leaseholds, securities or letters of credit."); *E.I. Du Pont de Nemours & Co. v. United States,* 200 Ct.Cl. 391, 471 F.2d 1211, 1218 (1973) ("[C]ourts have advocated a generous definition of 'property.'").

505, 512 (N.Y.App.Div.1979) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("the word 'property' has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage 'property' comprehends anything of material value or possessed[.]")); *In re Tiffany's Estate*, 143 A.D. 327, 128 N.Y.S. 106, 107 (N.Y.App.Div.1911) ("[T]he Legislature of this State ... considered promissory notes property[.]"). Therefore, the court has determined the Stemco Note must be considered property in this case and the first requirement of Section 351 was met. *See* 26 U.S.C. § 351(a). As discussed herein, since the Stemco promissory note is property, it is entitled to be assigned a basis, which would not be allowed if it were a liability.

### b. Coltec And Garlock Received Only Stock From Garrison.

Coltec received 93% of the equity of Garrison; Garlock received 7% of the equity of Garrison. Therefore, the second requirement of Section 351 was met. *See* 26 U.S.C. § 351(a).

### c. Immediately After The Exchange, Coltec And Garlock Had 100% Control Over Garrison.

Section 351 applies only if the property contributed is owned by the same persons both before and after the exchange. As the Honorable Alex Kozinski, a former Chief Judge of the United States Court of Federal Claims, now sitting on the United States Court of Appeals for the Ninth Circuit, has observed:

> Continuity of investment is the cornerstone of nonrecognition under [S]ection 351. Nonrecognition assumes that a capital contribution amounts to nothing more than a nominal change in the form of ownership; in substance the shareholder's investment in the property continues.

*Peracchi*, 143 F.3d at 490; *see also* BITTKER & EUSTICE ¶ 3.03[2], at 3–17 ( [Section 351(a) ] is "designed to ensure that the transferor will retain a continuing equity interest in the transferor corporation so as to justify nonrecognition of the gain or loss that is realized upon the exchange.").

In this case, immediately after the exchange, Coltec and Garlock owned and controlled 100% of the total combined voting power of all classes of Garrison stock entitled to vote. Therefore, the third requirement of Section 351 was met. *See* 26 U.S.C. § 351(a).

### 2. Garrison's Assumption Of Garlock's Contingent Liabilities Did Not Reduce Garlock's Basis In Garrison Stock.

#### a. The Effect Of Section 358(d)(1).

■ The assumption of liabilities typically is treated as money received. *See* Section 358(d)(1). Although the Code does not define "liability," Treas. Reg. § 1.461–1(a)(2)(i) provides that, for an accrual method taxpayer, a liability "is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability [and] the amount of the liability can be determined with reasonable accuracy." *See also* 26 U.S.C. § 461(a); *Brown v. Helvering*, 291 U.S. 193, 200, 54 S.Ct. 356, 78 L.Ed. 725 (1934) ("Except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent."); BLACK'S LAW DICTIONARY 925 (7th ed.1999) (emphasis in original) ("1. The quality or state of being legally obligated or accountable ...—Also termed *legal liability*. 2. (*often pl.*) A financial or pecuniary obligation; DEBT <tax liability>[.]").

In this case, the estimated $371.2 million of Garlock asbestos liabilities assumed by Garrison were contingent, since both of the events necessary to establish the fact of the liability had not occurred, *i.e.*, the filing of a lawsuit asserting a claim and an adjudication of liability. *See Crane v. Commissioner*, 331 U.S. 1, 7, 11, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947) ("[W]ords of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses. [Therefore,] we can conclude that the proper basis ... is the value of the property, undiminished by mortgages[.]"). From a tax perspective, Coltec will reduce its basis in the Garrison stock if and when the liabilities accrue and are satisfied by Garrison. *See*

*Jewell v. United States,* 330 F.2d 761 (9th Cir.1964) ("Congress was willing to leave the tax consequences of the exchange here involved to come out in the ultimate wash, the disposition by [Garrison] of [its] stock. The fact that [Garlock] was paid nothing for [Garrison's assumption of liabilities] will mean that it has no basis [since liabilities have no basis], ... but [Garlock] will be taxed accordingly upon what it gets for [the stock at the time it is sold].")." *Id.* at 767; *see also* A–TR 180–81. Therefore, as a matter of law, Garlock was not required to reduce the basis of its stock, under Section 358(d)(1), by the liabilities assumed by Garrison.

In fact, Congress became aware that Section 358(d)(1) did not require a transferor in a Section 351 exchange to reduce basis in stock received by the amount of any contingent liabilities assumed by the transferee and so it changed the law, enacting 26 U.S.C. § 358(h), effective October 18, 1999, "to include any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of the title." 26 U.S.C. § 358(h)(3); *see also* H.R. Conf. Rep. No. 106–1033 at 1019 (2000). The Garrison transaction, however, took place in 1996. For this additional reason, the court has determined, as a matter of law, that Section 358(d)(1) is not applicable in this case.

### b. The Effect Of Section 357(b)(1)'s "Tax Avoidance" And "Business Purpose" Tests.

Assuming *arguendo* that the Garlock contingent asbestos liabilities assumed by Garrison were included within the scope of Section 358(d)(1), as the Government argues, thus requiring the assumption of liabilities to be treated as money, such liabilities, nevertheless, are excluded from recognition by operation of Section 358(d)(2) and Section 357(c)(3)(A)(i), unless Section 357(b)(1) applies. Turning first to Section 357(b), here Coltec must establish thereunder that Garrison's assumption of the Garlock liabilities was not undertaken for "the principal purpose ... to avoid federal income tax[.]" 26 U.S.C. § 357(b)(1)(A); *see also* A–TR 20, 79–81. In addition, Coltec must demonstrate that assumption of such liabilities also had a "bona fide business purpose." 26 U.S.C. § 357(b)(1)(B). Both of these "tests" must be established by a "clear preponderance of the evidence." 26 U.S.C. § 357(c).

### i. The "Tax Avoidance" Test.

The existence of tax avoidance motives does not preclude a transaction from meeting the requirements of Section 357(b)(1), as the oft-quoted dictum of *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), makes clear:

The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.

*Id.* at 469, 55 S.Ct. 266; *see also Frank Lyon Co. v. United States,* 435 U.S. 561, 580, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1977) ("We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.").

In this case, Coltec's CEO, John Guffey, clearly was aware of the potential tax savings that may result from the formation of Garrison, but he testified that the tax benefit was not "the principal reason" for his approval of the transaction:

Q. [Coltec's Counsel:] And were you in 1996 ... aware of the tax benefits that would flow from the restructuring that was proposed?

A. [Mr. Guffey:] You know ... I'm sure I would have been—that would have been attractive, that if there was a tax benefit, that's a plus ... I can tell you this, that it would not have been overweighing, overpowering motivation for [me]. Again, even though tax sometimes can be significant, it is something I can define, you can afford it, what it did for us on the asbestos side would have been my passion ... it really was just a continuation of the work in process we had. We were working continuously to control as best we could this monkey that was right around the corner all the time on our back: asbestos.

TR 86–87; *see also* JX 115 at G15209–11; A–TR 121–24, 151–52. The court found Mr. Guffey's testimony to be candid and credible. A–TR 219.

Guffey had every reason to be concerned about veil piercing claims against Garlock and Coltec in light of Anchor's diminishing insurance coverage. By June 1995, three of Garlock's insurers—Mission, Transit, and Integrity—were insolvent. TR 673. As O'Reilly testified:

> At that time it was questionable on the Equitos side of the London coverage because, again, that was a fairly recently new established run-off company from Lloyds. We knew North River had some solvency issues, and was at that time part of Xerox, but Xerox was trying to unload it and nobody was taking it. And Home had some issues that were just starting to bubble at that time. They eventually did go into insolvency[.]

TR 673.

By 1996, despite O'Reilly's best efforts to stretch out Anchor's insurance coverage for asbestos claims, it was nearly exhausted. TR 74–78, 109–11, 672–77, 797–98. To make matters worse, asbestos claims were increasing, as an independent review prepared by Peat Marwick LLP confirmed:

> The most important observation about the [asbestos] filings is that there have been large increases in recent years:
>
> • From about 12,000 claims in 1993 to 41,000 in 1994 for the UNR Trust;
>
> • From 15,000 claims in 1993 to about 26,000 claims in 1994 to nearly 46,000 claims in 1995 for the Manville Trust;
>
> • From about 28,000 claims in 1994 to 46,000 claims in 1995 for [Owens–Corning Fiberglass];
>
> • From 26,000 claims in 1994 to 48,000 claims in 1995 to over 50,000 claims in 1996 (estimated) for Garlock.
>
> The recent surge in filings has impacted all defendants and all trusts receiving claims.

PX 150 at BOA 814. Peat Marwick's Report further concluded that "the estimates of liability arising from present and future claims against Garlock and Anchor . . . are based on reasonable and appropriate theory and methods given the data available at the time these estimates were prepared. . . . It is our opinion [, however,] that the actual liability estimate is more likely to [be] higher than . . . it is to be lower." PX 150 at BOA 818–19; *see also* PX 145 at BA 1052–53; TR 1599–1600.

On December 4, 1995, Coltec met with Kaye Scholer, the law firm that represented Johns–Manville, to discuss the option of placing Anchor, and perhaps Garlock, into bankruptcy—at the same time the proposed Garrison transaction was being considered. TR 681–84; *see also* TR 77. Although Coltec ultimately decided not to pursue bankruptcy and try to continue to defend asbestos claims against Anchor, Coltec "had an overriding fear that when the insurance assets had been depleted, that we would be facing challenges from the plaintiff bar to pierce the corporate veil, establish successor liability or any type of fraud action, any type of action whatsoever that could get beyond Anchor into the Garlock assets and/or the Coltec assets and that was an overriding daily concern that we in the litigation side of things faced." TR 676–77. Therefore, during 1996, Kaye Scholer continued to work with Tillinghast to obtain a better grasp of the financial impact of the asbestos situation and advise the Coltec Group about bankruptcy options until the company was sold. TR 682.

The isolation of Garlock's contingent liability exposure from Coltec's core business also was an important factor in the company's ability to attract a suitor that might be willing to acquire the entire Coltec Group.

> Q. [Coltec's Counsel:] Well then what if any did a separate corporation like Garrison to manage the asbestos liabilities have on your ability either to be acquired, Coltec be acquired or for Coltec to do the acquiring?
>
> A. [Mr. Guffey:] Oh, I think that's—that was, that would have been a real—that was a real plus to us. Garrison also, I should have mentioned before, when we were thinking about Garrison, another part of my job was I spent a lot of time on Wall Street. When I say Wall Street, in the financial community, I spent a lot of my time giving presentations at seminars put on by Morgan Stanley, Shearson, Gabelli, et cetera. They would have these throughout the year. And you go in and tell your story. I also—we

were largely institutionally held from the shareholder standpoint, so it was very usual for me to meet with Neuberger Berman, J.P. Morgan on the investment side and these various—T. Rowe Price here in Baltimore, to[o]— they were major shareholders. And they put you under quit [sic] a grilling about your company. And one question that would always come up was asbestos. And not to drag this out but I will use the word fence. I could define a tax cost, if you want to know what a tax rate is, I can define that and tell how many dollars it is. If they want to know how much capital you are going to spend in the year 1996, I could tell them what our budget was and could come pretty damn close, we are going to spend 80 million on capital. When it came to asbestos, there was no definition. And that was true of everybody that was in this problem. You couldn't put a fence around it. So one of the things that a separate corporation did, at least we had a business plan within the separate corporation, I visualized we could have this business plan, we would have a definition in it for that time frame, at least, where we could talk to the investment community about what we were doing with asbestos, how we were managing it, how we looked at quantifying it, what it meant to us in their time frame. That same vehicle would help us in any merger talks. There is a process called due diligence. If you are open to a merger talk and each side has due diligence teams, the better you can define every area of their questioning, of whether they are buying a good asset or not, is

to your benefit and their benefit. So having it separate—and it worked out that way for us in discussions we had on mergers, *having a separate entity defining the management of it and having experts within that entity to define what they were doing about the management of it, I think proved to be a plus.*

TR 81–83 (emphasis added).

\*     \*     \*     \*     \*     \*

Q. [Coltec's Counsel:] And do you believe that Garrison played any role in the deal you were able to make in the acquisition by Goodrich?

A. [Mr. Guffey:] It would be my opinion absolutely yes.

TR 86; *see also* TR 83–85, 135–36, 160–61.

In 1996, Coltec's tax liabilities resulting from the sale of Holley Automotive of approximately $100 million paled in comparison with the potential payment of $371.2 million plus for contingent asbestos liabilities, possible bankruptcy of Anchor and Garlock, and impairment of Coltec's ability to sell the entire company intact. DX 1000 at 15 ("[T]he pressing strategic challenge [for Coltec] was to prevent plaintiffs who had sued Anchor from piercing its corporate veil or proving successor liability and dragging Coltec, Garrison, Garlock, or all three into litigation."); JX 1; TR 254.[21] Moreover, the court does not consider the expenses of $1 million for attorney, accounting, and other expert fees to implement Garrison to be excessive given what was at stake. AR 160–63.

For all of these reasons, the court has determined that the record establishes by a clear preponderance of the evidence that the principal purpose of Coltec entering into the Garrison transaction was not solely to avoid

---

**21.** *See* RAND, at 87 ("[A]s the litigation has spread ... the culpability of the defendants called upon to pay asbestos victims is in more dispute. In this context, the issue is not *whether* asbestos victims should be able to receive compensation from some entity, but rather *what entity* should fairly be called upon to shoulder the financial burden."); WLF ASBESTOS LITIGATION, at 2 (quoting Robert Vagley, American Insurance Association: "Even companies that once owned a subsidiary which prior to the time they owned it may have used, sold, or distributed products containing asbestos, are now being targeted."); *see also id.* at 10 (emphasis added) (quoting William T. Gallagher, Senior Vice President and General Counsel, Crown, Cork & Seal: "As General Counsel of a manufacturing company ... I've found my time taken up helping to defend our company against the greatest mass litigation in the history of mankind arising from *a product our company never manufactured and related to exposure to another company's asbestos products that occurred before almost every man and woman working for our company finished school.*").·

federal income tax, in light of the highly uncertain legal environment in which Coltec was attempting to conduct business. *See* GEVURTZ § 1.5, at 70 (emphasis added) ("*[P]iercing claims constitute the single most litigated area in corporate law*.... It is therefore especially unfortunate that ... judicial opinions in this area have made it one of the most befuddled.").

### ii. The "Business Purpose" Test.

■ *Estate of Kanter v. Commissioner*, 337 F.3d 833 (7th Cir.2003) was the principal case relied on by the Government to establish the parameters of the "business purpose" test under Section 357(b). *Estate of Kanter* concerned six different tax deficiencies that arose from the probate of an estate. One of the challenged deficiencies concerned a transaction where an inactive shelf corporation was used to receive real estate partnership interests in exchange for common and preferred stock. *Id.* at 863. Eight promissory notes with a face value of $498,500, dated May 1, 1983 but payable on August 1, 1983, were transferred to the shelf corporation. *Id.* The taxpayer argued that the notes had a basis equal to their face value which increased the total aggregate basis of the real estate partnership, so that the gain, otherwise realized under 26 U.S.C. § 357(c), would be eliminated. *Id.* Stock in the shelf corporation then was sold to a third party real estate developer for $1.5 million in promissory notes. *Id.* at 863–64. When the dust settled, the developer and new owner of the shelf corporation held all of the stock, real estate partnership, and $498,500 cash derived from payments on the notes. *Id.* at 864.

The United States Court of Appeals for the Seventh Circuit characterized the taxpayer's argument, that the principal purpose of this transaction was not to avoid federal income tax and that it had a *bona fide* business purpose, as "meritless:"

> Within a four-month period of time an inactive shelf corporation controlled by [the taxpayer] had its stock transferred three times, twice between [taxpayer]-controlled entities. Within that same time span, promissory notes, virtually equal in total value to the total negative capital account balances, were made by entities controlled by [the taxpayer], transferred ... to entities controlled by [the taxpayer] and then satisfied by entities controlled by [the taxpayer]. Both [the shelf corporation] and the promissory notes completed their entire useful life-cycle within the span of the larger, intended transaction—transferring the real estate partnership interests to [a real estate developer].... [T]he entire transaction was constructed to avoid the recognition of the gain realized on the assumption of the real estate partnerships' liabilities (by, ultimately, [the real estate developer]). Therefore, the assumption of those liabilities by [the shelf corporation] in the initial stages of the process cannot be described as other than having as its principal purpose the avoidance of federal income tax. *See* 26 U.S.C. § 357(b).... The fact that the liabilities being contributed were "ordinary business liabilities of the partnerships" does nothing to save this transaction. As noted, the entire business of contributing the partnership interests and their associated liabilities to [the shelf corporation] was a transaction whose only function was the avoidance of federal tax.

*Kanter*, 337 F.3d at 865–66.

The court has identified four other federal appellate courts that also have considered Section 357(b) or its predecessors in the six cases; however, they are "so varied in their fact situations that it is difficult to classify and reconcile them." *Jewell*, 330 F.2d at 767. Nevertheless, these cases are summarized here in brief since they represent what appellate authority exists regarding Section 357(b)'s "business purpose" test.

The most recent consideration of Section 357(b) was in *Drybrough v. Commissioner*, 376 F.2d 350 (6th Cir.1967), wherein the United States Court of Appeals for the Sixth Circuit determined that the "business purpose" test was satisfied where:

> For many years [the taxpayer] was engaged in the business of buying and holding downtown ... real estate, and operating those holdings in various enterprises such as parking lots. The conversion of these businesses into corporate form was clearly to serve a bona fide business pur-

pose. What was done here was substantially the 'garden variety' of tax free exchange—the shift of a proprietorship to a wholly owned corporation which assumed the debts of the proprietorship.

*Id.* at 358. In reaching this conclusion, this federal appellate court relied on *W.H.B. Simpson v. Commissioner,* 43 T.C. 900, 1965 WL 1246 (1965), holding that a determining factor was that the taxpayer "did not incur the liabilities to which the transferred securities were subject *immediately prior to the transfer and* solely in *anticipation thereof.*" *Id.* at 917 (emphasis added).

In *Campbell v. Wheeler,* 342 F.2d 837 (5th Cir.1965), the United States Court of Appeals for the Fifth Circuit examined a situation where, in order to satisfy a tax obligation, the taxpayer borrowed $12,000 from a bank, secured by a three percent interest in a corporation and a separate partnership. *Id.* at 839. Both entities were transferred to a new corporation in exchange for stock and assumption of a personal note with interest. *Id.* That federal appellate court held that the assumption of the note was "boot" to the taxpayer and therefore was required to be recognized under Section 357(b), since "payment of one's personal tax liability, even if it is derived in part from business enterprises, is a purely personal obligation. We do not perceive how, . . . facilitation of [the note's] payment can be a bona fide business purpose for arranging an assumption of the taxpayer's personal note by a controlled corporation." *Id.* at 840–41.

The taxpayer, in *Bryan v. Commissioner,* 281 F.2d 238 (4th Cir.1960), *cert. denied,* 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364 (1961), purchased four tracts of land for $1,485,701.96, on which he constructed houses with $1,692,350 from FHA mortgage insurance that later was purchased by the Federal National Mortgage Association. *Id.* at 241. The taxpayer also secured construction loans in the same amount, from which he took advances over time up to the amount of $1,643,500, which exceeded his actual costs by $157,798.04. *Id.* Next, four corporations were created to which the four tracts of land were conveyed in exchange for $500 stock from each corporation and their proportional assumption of the construction loan. *Id.* at 241–42. These corporations then borrowed $1,692,350 from a bank, secured by notes of deed and trust and the taxpayer's personal guarantee. *Id.* at 242. The taxpayer's initial personal loans of $157,798.04 were paid off by selling the proceeds of the corporation's loans. *Id.* Clearly, in that case, the payment of the taxpayer's personal indebtedness was recognized to have "no business connection with the property." *Bryan,* 281 F.2d at 242. Moreover, the taxpayer's argument that the assumption of indebtedness was not "other property" was rejected and, instead, the United States Court of Appeals for the Fourth Circuit held that the taxpayer's "only purpose was to appropriate to himself a major portion of the excess funds which had been committed by FHA and FNMA, and to do it in a form which gives him hope of avoiding federal taxes on the funds with which he enriched himself." *Id.*

The United States Court of Appeals for the Ninth Circuit has considered three cases where the applicability of Section 357(b) was at issue. In *Wolf v. Commissioner,* 357 F.2d 483 (9th Cir.1966), the merits of *bona fide* business purpose were not directly addressed, but rather this federal appellate court held there can be no exchange under Section 351 where assumption of taxpayer's personal liability is at issue. *Id.* at 485–86 ("The purpose of the transaction was essentially an escape of a tax upon a dividend[.]"). In *Jewell,* however, a taxpayer and co-partner dissolved their partnership and organized a corporation that assumed liabilities and issued notes to replace those of the corporation. *Jewell,* 330 F.2d at 763. To date, the payments made by the corporation and a note, replacing the taxpayer's notes, were held not to constitute a constructive dividend, so the court declined to consider whether the transaction had a *bona fide* business purpose. *Id.* at 767. Finally, in *Easson v. Commissioner,* 294 F.2d 653 (9th Cir.1961), a taxpayer's exchange of an apartment encumbered with a mortgage that exceeded taxpayer's basis in the capital stock of the corporation was determined to have a legitimate business purpose under a predecessor statute to Section 357(b). *Id.* at 660–61.

To date, the United States Court of Appeals for the Federal Circuit has not addressed directly the requirements of Section 357(b) and, as discussed above, other federal appellate precedent is sparse; nevertheless, a few principles can be derived that are applicable to the Garrison transaction. First, business purpose is to be examined "narrow[ly] to a purpose *'with respect to the assumption'* [of a liability] and to a purpose to avoid income tax 'on the exchange.'" *Drybrough,* 376 F.2d at 356; *see also* A–TR 84. Second, the closer the nature of the liabilities to the customary business of the transferee and its continued viability, the more likely that Section 357(b)'s principle "business purpose" test will be satisfied. *Id.; see also* Treas. Reg. § 1.368–2(g) (stating that to qualify as a reorganization, a transaction "must be undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization."). Third, if the liabilities were incurred well before the transfer of stock, the more likely it is they will be considered as incurred for a business purpose and not tax avoidance. *See, e.g., Drybrough,* 376 F.2d at 358; *Easson,* 294 F.2d at 659. Fourth, the longer the life span of the corporate vehicle utilized and term of any promissory notes issued, the more likely a court will find the transaction to have been undertaken for a "business purpose." *See, e.g., Gregory,* 293 U.S. at 469–70, 55 S.Ct. 266; *Estate of Kanter,* 337 F.3d at 865–66.

The contingent asbestos liabilities assumed clearly were related to Anchor's, Garlock's, and Garrison's ordinary business, and the management and minimization of such liabilities were essential to the continued viability of Anchor and potentially Garlock.[22] There-fore, "[t]he conversion of these businesses into corporate form was clearly to serve a *bona fide* business purpose." *Drybrough,* 376 F.2d at 358 (emphasis added). The events that gave rise to these contingent liabilities, however, took place well before the Garrison transaction. In addition, the facts that the Stemco promissory note had a 15–year term and that Garlock, Stemco, and Garrison continue to function today—eight years after the formation—of Garrison also weigh in favor of the Garrison transaction being viewed as having a *bona fide* business purpose. And, the separate Garrison structure became an important factor in Coltec's ability to sell the company to B.F. Goodrich Corporation in 1999. TR 135–36, 160–61. Accordingly, for these reasons, the court has determined that the record in this case establishes that Garrison's assumption of Garlock's contingent asbestos liabilities had a *"bona fide"* business purpose that satisfied Section 357(b) by a clear preponderance of the evidence.

### c. The Effect Of 26 U.S.C. § 357(c)(3)(A)(i).

■ In the alternative, assuming *arguendo* that the Garlock contingent liabilities assumed by Garrison are subject to Section 358(d)(1), Garlock's basis is not required to be reduced under 26 U.S.C. § 357(c)(3)(A)(i), because it excludes liabilities that prior to the Section 351 exchange "would give rise to a deduction." 26 U.S.C. § 357(c)(3)(A)(i).[23]

Prior to the Garrison transaction, Garlock treated accrued and paid asbestos liabilities as ordinary and necessary business expenses. Compl. Exh. I; A–TR 8–10, 13; *see also* Rev. Rul. 95–74, 1995–2 C.B. 36 (stating that liabilities assumed by a newly-formed subsid-

---

22. "U.S. defendants have spent from $20 billion to $24 billion on asbestos litigation through 2000. In their bankruptcy filings and related documents, corporations filing for bankruptcy have reported expenditures (including costs recovered from insurance) ranging from $450 million to $5 billion. We are aware of at least five defendants who have each spent more than a billion dollars a piece ... A very much larger group of defendants has spent relatively small amounts, but in the aggregate they add up to several billions of dollars." RAND, at 55.

23. Since the court has determined that the "principal purpose" of Garrison's assumption of Gar-lock's liabilities was not to avoid taxes and the assumption had a proper business purpose, it is not necessary to resolve Coltec's alternative argument regarding the relevance of Field Service Advice 1999–05–008 ("I.R.C. § 357(c)(3) ... does not contain an exception for I.R.C. § 357(b). Thus, even if I.R.C. § 357(b) applied SI [Garlock] would not be required to reduce the basis of its S2 [Garrison] stock by the amount of the contingent liabilities assumed. Consequently, we do not believe that the application of I.R.C. § 357(b) will cause SI [Garlock] to reduce the basis of its S2 [Garrison] stock by any liabilities assumed").

iary in a Section 351 exchange are not liabilities for purposes of Section 357(c)(1) and Section 358(d) because the liability had not been taken into account by the parent corporation before the transfer, but instead are deductible by the subsidiary as ordinary and necessary business expenses under Section 162(a)). Nevertheless, the Government maintains that Garlock, rather than Garrison, may claim the Section 162(a) deduction after the Section 351 exchange, because it also retains the underlying liability. A–TR 102–03. The Government, however, ignores the fact that Garrison legally assumed Garlock's contingent asbestos liabilities, which will be paid, only if and when they accrue, first from any Anchor insurance proceeds transferred to Garrison and then from the interest payments made on the Stemco Note. A–TR 102–03. As Professor Ginsburg's treatise recognizes, however:

> the transferee [Garrison] should be entitled to deduct the contingent liabilities as they become fixed and determinable, in accordance with its method of accounting, to the extent that the contingent liabilities would have been deductible [prior to the exchange] by [Garlock]. *See* Rev. Rul. 95–74.[24] The assumed contingent liabilities are not treated as part of [Garrison's] basis in the acquired assets and [Garlock] (as opposed to [Garrison]) is not entitled to take any deduction as the assumed contingent liabilities become fixed and determinable. *See* [26 U.S.C.] § 362.

GINSBURG & LEVIN ¶ 901.1.3; *see also* BITTKER & EUSTICE ¶¶ 3.06[4][c], 3.06[7], and 3.10[3]; A–TR 182–84.

Another federal trial court recently recognized that "Section 357(c)(3)(A) does not ex-plicitly state whether contingent liabilities must be deductible by the transferor or a transferee in a § 351 exchange to fall within the exception." *Black & Decker Corp. v. United States*, 2004 WL 2051215 (D.Md. Aug. 3, 2004). In that case, a United States District Court resolved this issue by looking to the legislative history. *Id.* at *3 (finding no support for the Government's contention that "§ 357(c)(3)(A) requires that contingent liabilities assumed by a transferee in a Section 351 exchange need not be recognized if the liabilities assumed would have given rise to a deduction for the transferor.").

Whether the analysis is resolved by the statutory approach elected herein or reliance on the legislative history, both federal trial courts have reached the same conclusion. Thus, in this case the contingent nature of Garlock's asbestos liabilities may not be considered in determining Garlock's basis in the Garrison stock since, at the time of the Section 351 exchange, those liabilities had not accrued nor been satisfied. When such liabilities, in fact, accrue and are satisfied, Coltec then may deduct them as ordinary and necessary business expenses, at which time Garlock also must adjust its basis in the Garrison stock. *See* Treas. Reg. 1.1502–32(a), (b)(1)-(b)(3) (requiring determination of parent corporation's basis in subsidiary's stock by adjusting parent corporation's basis to reflect distributions, income, gain, deductions, and losses of subsidiary); A–TR 10–18, 176–78.

### 3. Other Property.

■ Next, the Government argues that even if Garlock's contingent asbestos liabili-

---

**24.** At the Post–Trial Argument, the Government attempted to distinguish Rev. Rul. 95–74 from the Garrison capitalization on the basis that Garlock transferred only liabilities and the Stemco Note to a closely-held entity, Garrison, while the taxpayer in Rev. Rul. 95–74 transferred an entire business, including liabilities, to an unrelated entity. A–TR at 197–99. In Rev. Rul. 95–74, a corporation (P) transferred substantially all of its assets associated with its manufacturing business to a newly-formed subsidiary (S) in a valid Section 351 transaction, in exchange for all the stock of S and S's assumption of the liabilities associated with the manufacturing business. Rev. Rul. 95–74, 1995–2 C.B. at 36. In order to remediate the liabilities, S incurred costs considered ordinary and necessary business expenses deductible under Section 162(a). *Id.* at 36–37. The IRS determined that because the liabilities had not been deducted by P before they were transferred to S, they were not liabilities for purposes of Sections 357(c)(1) and 358(d). *Id.* at 38.

The Government, however, argued that only Garlock, rather than Garrison, is entitled to take deductions under Section 162(a) for the liabilities, as they are accrued, and therefore do not satisfy the requirements of Section 357(c)(3). *Id.* The court discerns no material facts that would preclude Coltec from relying on Rev. Rul. 95–74, since Garlock's contingent liabilities were not deducted prior to the Section 351 exchange, like (P) in Rev. Rul. 95–74.

ties are not "liabilities" under Section 358(d)(1), they may be treated as "other property" under Section 358(a)(1)(A)(i), requiring a basis reduction. Gov't Post–Trial Memorandum at 13–14.; A–TR 20, 81. A liability is not an asset and therefore is not property or "other property." *See supra* note 20.

### 4. Determining Basis.

"The basis of property shall be the *cost of* such property[.]" 26 U.S.C. § 1012 (emphasis added).

#### a. Garlock's Basis In Anchor Stock.

The parties stipulated that Garlock's basis in Anchor stock was $4,206,901. TR 63–65, 76–78, 676–77, 679–84.

#### b. Garlock's Basis In The Stemco Note.

The August 1, 1996 Stemco Note had a face value of $375 million, a 15 year term, with interest to be paid quarterly, beginning with an initial two-month rate of 8¼% per annum and thereafter fluctuating according to prime. JX 27 at 614811. The Stemco Note was not registered as a security and therefore was not as easily marketed. JX 27 at 614811–21. Coltec advised the court that the $375 million face value includes a $262,751,891 intercompany account payable owed by Stemco to Garlock. A–TR 21–23. At trial, however, Coltec never established the origins or *bona fides* of this account payable and Guffey testified that neither Stemco nor Garlock provided each other with products or services. TR 93–94, 257–68. Andolino had no knowledge of this account payable either. TR 181–82. Moreover, the *bona fides* of the $112,248,109 balance, the court was advised should be treated as a "distribution" from Stemco to its parent company Garlock, likewise was never established by Coltec, nor challenged by the Government. TR 168–87, 265.

Stemco's 1995 year-end balance sheet showed assets of $117 million and liabilities of $60 million. JX10 at BA0284. Stemco also reported less than $38 million in retained earnings on its books and therefore

appeared not to have sufficient earnings to operate the company and also pay the approximate $30 million of interest that would be due Garrison each year on the Stemco Note. JX 10 at BA0284; TR 1193–94. Because Stemco's ability to pay the interest was in question, a Garlock Note of almost $315 million was issued, made payable upon demand with interest at 8%. JX 31; TR 265–68. The Garlock Note, however, was unsecured, so that in the event Garlock defaulted and if Stemco demanded payment, Stemco could not have attached any of Garlock's assets. Therefore, whether Garlock in fact assumed "genuine" liability for the Stemco Note, remained an unanswered question to the court. A–TR 34–36. More importantly, whether Stemco could or ever would demand payment of the Garlock Note, because of Coltec's control over both entities, is also an issue that was not resolved to the court's satisfaction. *See Peracchi*, 143 F.3d at 492–93 ("[A]ll [the taxpayer] did was make out a promise to pay on a piece of paper, mark it in the corporate minutes and enter it on the corporate books. It is also true that nothing will cause the corporation to enforce the note against [the taxpayer] so long as [the taxpayer] remains in control."). The record in this case establishes that Garlock had sufficient operating revenues to support payment of the interest and confirms that Garlock, in fact, made all interest payments due to Stemco, thereby providing Stemco with sufficient funds to pay interest due to Garrison. JX 89, 106, 108, 110; PX 425; TR 257, 454–56, 1204–07; A–TR 159. Moreover, the enforceability of the Stemco and Garlock Notes was not questioned by the Government's expert, Dr. Kolbe. PX 163 at G16583; TR 2346–47; A–TR 24–27.

At the Post–Trial Argument, the court indicated that it continued to be troubled about the basis attributed to the Stemco Note because of concerns about whether the Garlock Note could or would be enforced by Stemco in light of Coltec's ability to control Stemco and Garlock. A–TR 19, 23–24, 28–29, 32, 74, 103, 191.[25] Rather than challenge the basis determination as not reflecting the "cost" of

---

**25.** The Government's expert, Dr. Raymond J. Ball, the Sidney Davidson Professor of Accounting in the Graduate School of Business at the

University of Chicago, persuasively testified that it was not appropriate under generally accepted accounting principles to treat the transfer of the

the Note,[26] instead the Government decided that this issue "factors into the analysis, primarily in the economic substance element of the agreement." A–TR 104. Since the Government stipulated at the Post–Trial Argument that Garlock's basis in the Stemco Note was $375 million, the court must so hold, but with continued skepticism.[27] A–TR 131, 191–92.

### c. Garlock's Basis In Garrison Stock.

If property was acquired after June 22, 1954 by a corporation in connection with a transaction to which Section 351 applies, "the basis [of property received] shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer." 26 U.S.C. § 362(a)(1); *see also* 26 U.S.C. § 358(a)(1).

In this case, Garlock's basis in the Garrison stock is the sum of the $4,206,901 basis in the Anchor stock and the $375 million stipulated basis in the Stemco Note, *i.e.*, $379,206,901.

### 5. Garlock's Transaction With The Banks Was A *Bona Fide* Sale Of Property.

■ Section 1001(c) requires that "the entire amount of the gain or loss ... on the

Stemco Note as a contribution of an asset and as a contribution to the capital of Garrison. DX 440 at GOV 0460, 0466–67; DX 691; TR 1998–2009. Dr. Ball further advised the court that Emerging Issues Task Force (EITF) No. 85–1 states: "reporting the note as an asset is generally not appropriate, except in very limited circumstances when there is substantial evidence of ability and intent to pay within a reasonably short period of time. Some Task Force members would require collateralization, or payment of the note prior to issuance of the financial statements, to permit asset recognition." JX 89 at 0092; DX 440 at GOV 0467. Instead, Dr. Ball testified that "[t]he appropriate accounting is to record the Note as exactly offsetting the amount of new share capital issued to Garlock in exchange for it." DX 440 at GOV 0470. That amount would be $10 million. DX 440 at GOV 0468 (citing Garrison 1996 financial report footnote). Indeed, for this reason, Coltec's auditor Arthur Andersen issued a restricted opinion, which states that: "Garrison's note does not meet the criteria [EITF No. 85–1], as the note is unsecured and longer term. Due to the tax sensitivity of this transaction, the client is not willing to classify the note receivable as an offset to equity." DX 440 at GOV 0468.

On the other hand, the court also heard credible testimony from Coltec's expert, Professor

sale or exchange of property shall be recognized." Therefore, the first relevant inquiry is whether the terms of the Shareholders Agreement affected Garrison stock so that it no longer was property. The second inquiry is whether the transfer of Garrison stock to the Banks in exchange for $500,000 was a sale.

### a. The December 20, 1996 Shareholders Agreement Between Coltec And The Banks Did Not Affect The Property Rights That The Banks Obtained In Garrison Stock.

### i. The Property Garlock Transferred To The Banks Was "Stock."

It is well established that stock is considered property for federal income tax purposes. *See, e.g., Peracchi,* 143 F.3d at 489; *E.I. DuPont de Nemours & Co.,* 471 F.2d at 1211. Stock is defined as "the permanent proprietary ownership or equity interest in a corporation, entitling the holder to (1) share proportionately in the profits of the business; (2) vote on matters affecting the corporate enterprise; and (3) share ratably in the as-

Jones, to the effect that GAAP and the tax rules are different. TX 9; TR 2652–82; *see also Lyon,* 435 U.S. at 577, 98 S.Ct. 1291 ("[T]he characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same.").

**26.** As Dr. Ball testified, the issuance of the Stemco promissory note was not conducted at arm's length, but instead between subsidiaries with a common parent, therefore, $375 million did not represent the note's fair market value. DX 440 at GOV 0469–70.

**27.** The lack of convincing documentation about the origins and *bona fides* of the intra-company transactions and the issue of Coltec's control over the creation of and potential enforcement of both the Stemco and Garlock Notes is an area that the Government did not aggressively pursue to its detriment. A–TR 127–33. The court is aware that promissory notes generally are assigned basis at face value, but the import of Coltec's control in this case made this an appropriate vehicle to test how "cost" should be determined in intra-company transactions. Rather than tackle that legal issue directly under 26 U.S.C. § 1012, however, the Government asks the court to abandon statutory moorings for the "open seas" of equitable doctrine.

sets of the venture (after payment of debts) upon liquidation[.]" Bittker & Eustice ¶ 12.41[2], at 12–185; *see also* Harry G. Henn and John R. Alexander, Laws of Corporations 396 (3d ed.1983) ("Henn") (defining stock or shares by "a three-fold proportionate interest in the corporation with respect to: (a) earnings, (b) net assets, and (c) control."). The record is clear that Garrison stock certificates were delivered by Garlock to the Banks, pursuant to the requirements of the December 20, 1996 Stock Purchase Agreement, together with all attendant rights. JX 76. In exchange, the Banks paid Garlock $500,000. JX 76. The Government, however, suggested for the first time at the Post–Trial Argument that Garlock's transfer of Garrison stock to the Banks was simply a "loan of a certificate to an accommodating party for a period of time to create an argument that there has been a sale or exchange upon which [Garlock's] basis can be recognized[.]" A–TR 107; *see also* TR 110; *compare with* Gov't Post–Trial Memorandum. The court cannot discern how the stock certificates were "loaned," based on the record.

The Garrison certificates were transferred, pursuant to the December 20, 1996 Stock Purchase Agreement, between Garlock and the Banks, for which the Banks collectively paid Garlock $500,000 as consideration. The December 20, 1996 Shareholders Agreement was a separate contract between Coltec and the Banks, pursuant to which the Banks were offered the opportunity to make substantial profit, if and when certain put and call options were exercised and to obtain access to confidential information regarding Garrison, in exchange for the Banks' agreement to obtain prior written consent from Coltec before transferring the Garrison stock to another party. JX 75; TR 2172–73. The "put" and "call" options were separate contractual rights distinct from the property interest that the Banks acquired in the Garrison stock. *See* Filer, at 9, 57. For this reason, "the federal tax consequences of an option's issuance are not recognized until the option lapses or is exercised." *Id.* at 108. The fact that the Banks never exercised their put option is irrelevant to whether they owned the Garrison stock, *i.e.*, exercised

"power and control over the ... property ... 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed the actual benefit for which the tax is paid.'" *Commissioner v. Sunnen*, 333 U.S. 591, 604–05, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (internal citation omitted). Likewise, the fact that Coltec did not exercise its call option did not affect the Banks' property rights in the Garrison stock. In addition, the Banks' promise not to transfer the Garrison stock without prior approval of Coltec also does not affect the Banks' property rights in and ownership of the Garrison stock. JX 75 at § 2.1. When Garlock relinquished physical control and title over the Garrison stock it "shift[ed] the incidence of income tax liability." *Sunnen*, 333 U.S. at 610, 68 S.Ct. 715 (holding that a taxpayer's assignment of license contracts to his wife was not a sale where he retained the power to control the payment of royalties, as well as ownership in the underlying patents); A–TR 44. In fact, the Banks could have sold Garrison stock to a third party without seeking Coltec's approval, and the third party could have taken title to the Garrison stock. Coltec would have no action against the third party, but instead would have to sue the Banks for a breach of the Shareholders Agreement for damages. *See* E. Allan Farnsworth, Farnsworth on Contracts § 11.8 (3d ed.2004) (stating that a claim for breach of contract cannot be used to impose liability on the third-party unless the third-party has assumed the assignor's duty of performance).

The Government's expert, Dr. McDonald, testified that the Garrison stock owned by Garlock and Coltec was "different" than that held by the Banks in several key respects. DX 1014 at §§ 3.2–3.3; TR 2186–87, 2193. First, the put option increased the marketability of what otherwise was a minority block of common stock. TR 2183–87. Second, Coltec's agreement to indemnify the Banks made the Garrison stock more attractive. TR 2203–05. Thus, Dr. McDonald concluded that the Garrison stock held by the Banks was not stock, but rather a default free, highly rated bond. TR 2167–68; A–TR 106. In the alternative, Dr. McDonald testified

that the Garrison stock could be viewed as a hybrid security, *i.e.,* one that combines the features of debt securities and stock. HENN, at 409. "Where the maturity and return are both fixed, [for tax purposes,] usually a debt obligation is found." *Id.* at 410. If neither a maturity date or return are fixed, the security usually is treated as stock. *Id.; see also id.* at 411. In this case, however, the Garrison stock did not have either a maturity date or a fixed return. PX 166; A–TR 169–71. Moreover, Section 1001(c) is concerned with "property," which could include stock, bonds, or hybrid securities.

Therefore, the court has determined that the Banks secured all property rights in and ownership of Garrison stock on December 20, 1996, by virtue of the Stock Purchase Agreement. JX 76. The separate Shareholders Agreement did not negate the legal or economic significance of the property rights that the Banks acquired in Garrison stock, as further evidenced by the fact that the Garrison stock is still owned and controlled by the Banks. JX 75; A–TR 174.

### ii. The Transaction Between Garlock And The Banks Was A "Sale" Of Garrison Stock.

Neither the language nor the history of the Code defines a "sale." In general, a "sale" is defined "in the ordinary sense of the word, [as] a transfer of property for a fixed price in money or its equivalent." *State of Iowa v. McFarland,* 110 U.S. 471, 478, 4 S.Ct. 210, 28 L.Ed. 198 (1884); *see also* BLACK'S LAW DICTIONARY 1337 (7th ed.1999) ("[t]he transfer of property or title for a price.").

The Government asserts that whether a sale has occurred is "an issue of law which the courts generally have resolved through evaluation of the facts of the individual case." Gov't Post–Trial Memorandum at 35. The court is advised that the key to that determination in this case is "whether a particular transaction is properly characterized as a sale is [a] determination of whether the benefits and burdens of ownership have passed from the seller to the buyer. There is an issue of fact to be determined by examination of the relationship created by the parties through the operative legal documents." *Id.* Accordingly, the Government initially listed a

number of indicia that it argued evidence that the transfer of the Garrison stock to the Banks was not a "sale." Most of these indicia, however, simply are not relevant to whether property was transferred for a price. To illustrate this point, the Government's contention first is stated, followed then by the court's response:

- "the Garrison shares acquired by the Banks represented a small minority interest in a closely-held corporation." Gov't Pre–Trial Memorandum at 31.

  The amount of stock transferred is not relevant to whether a sale occurs.

- "as Garrison did not pay dividends, the Banks' only opportunity to profit from the Garrison shares was through the transfer of the shares to another buyer." Gov't Pre–Trial Memorandum at 31.

  Whether or not a corporation decides to pay dividends is not relevant to whether a sale occurs nor whether or not a purchaser profits by the acquisition of such stock. *See Cottage Savings,* 499 U.S. at 563, 111 S.Ct. 1503 (citation omitted) (stating that a "stock dividend merely reflected the increased worth in the taxpayer's stock and that a taxpayer realizes increased worth of property only by receiving 'something of exchangeable value[.]' "). In fact, many corporations that do not declare dividends and that never produce a "profit" for their stockholders. *See* HENN § 327, at 913 ("The distribution of dividends ... is usually discretionary, within the business judgment of the board of directors.").

- "the Banks could sell their Garrison shares only with Coltec's approval." Gov't Pre–Trial Memorandum at 31.

  A right of refusal, however, does not negate the transfer of title. It simply makes the stock more difficult to remarket. *See* HENN § 281, at 758 (share transfer restrictions "preventing outsiders from obtaining ownership in the corporation ... are ordinarily recognized as proper.").

- "as a practical matter, Coltec was the only possible buyer for the Garrison

shares." Gov't Pre–Trial Memorandum at 31.

The record reflects that the Banks were the only sophisticated investors or financial institutions that Coltec was able to locate, during the period September 13, 1996 to December 31, 1996, willing to purchase Garrison stock. TR 126–27. There is no evidence in this record that "Coltec was the *only* possible buyer." Gov't Pre–Trial Memorandum at 31 (emphasis added).

- "the anticipated exit strategy for the Banks was through exercise of the put and call options in five years, with Coltec (or its designee) reacquiring the shares." Gov't Pre–Trial Memorandum at 31.

Whether the banks had an exit strategy or not has no bearing on whether Garrison stock was sold to them. In fact, "[b]y far the most common [share transfer] restriction is that making use of an option provision. Typically, they provide that a shareholder must offer the shares to the corporation ... before transferring the shares to an outsider. They might also provide for a binding buy-sell agreement with the corporation ... exercisable upon a specified event." HENN § 281, at 758.

- "analysis of the formulas established for the exercise price for the options created a high likelihood that Coltec would reacquire the shares at a pre-set fixed price ($40/share), regardless of Garrison's fortunes." Gov't Pre–Trial Memorandum at 31.

The fact that Coltec did not exercise its option to repurchase the Garrison stock, however, was anticipated by the Banks and factored into the price paid, but had no bearing on whether the Garrison stock was sold. And, as Coltec notes: "The fact that the Banks now continue to own the stock (with all options expired) conclusively disproves the argument that the stock was not sold." Coltec Post–Trial Brief at 18; *see also* HENN § 176 at 446 ("The record ownership of securities, both debt and other securities in registered form, as well as

shares, is conclusive evidence of such ownership for many purposes."); *see also* TR 304–05, 1521, 1530, 2612–13.

- "the only other realistic possible outcome was that the Banks would get nothing if Garrison became economically insolvent." Gov't Pre–Trial Memorandum at 31.

Certainly, if Garrison became insolvent, the Banks likely would receive nothing from a bankruptcy proceeding, but Garrison, in fact, did not become insolvent. Moreover, the potential for insolvency does not affect whether property was transferred for a price.

- "the Banks were given no significant role in operating or managing Garrison." Gov't Pre–Trial Memorandum at 31.

The Banks purchased a minority interest in Garrison and therefore would have no right to control or have a significant role in operating or managing Garrison. *See* HENN § 188, at 490–91 ("In a strict sense, management of the business and affairs of a corporation is under the direction of its board of directors, and shareholders have no functions of management as such.").

- "Coltec agreed to indemnify the Banks from liability in the event of any asbestos claimant successfully pierced Garrison's corporate veil." Gov't Pre–Trial Memorandum at 31.

Coltec's indemnification, however, cuts against the Government and supports Coltec's position that a sale took place because, if the Banks did not have a property right in Garrison stock, they would have no basis for concern about an asbestos claim or piercing the corporate veil.

- "Coltec agreed to keep secret the Banks' position as Garrison shareholders." Gov't Pre–Trial Memorandum at 31.

Whether the transaction was secret or a matter of public knowledge has no bearing on whether the Banks collectively paid Coltec $500,000 for Garrison stock.

This initial list of indicia was reduced and restated after trial, when the Government argued that the evidence showed that a "sale" of equity would have provided the Banks with:

(1) a *pro rata* share in the fortunes of the underlying venture,

(2) the ability to sell or transfer holdings to other parties,

(3) the ability to influence the management and governance of the venture,

(4) ownership rights for the lifetime of the venture,

(5) the potential for liability if the corporate veil is pierced.

Gov't Post–Trial Memorandum at 35.

A few additional comments are warranted. First, the Garrison stock purchased by the Banks entitled them to a proportionate distribution, like any other shareholder, if Garrison was liquidated. Second, the Banks were not restricted from selling Garrison stock to another party. The Banks simply had to provide Coltec with notice, so it could protect its interests regarding Garrison's business of managing Garlock's asbestos liability issues. Third, the Banks held a minority position in Garrison and therefore had no ability to control Garrison management, nor was this unusual. Fourth, the Banks certainly had ownership rights for the life of the venture—and still do. And, fifth, the Banks sufficiently were concerned about veil piercing that they too formed separate corporations to insulate their main business and required further indemnification from Coltec.

Before trial, the Government argued that "Coltec's economic relationship with the Banks is best viewed as a constructive non-sale." Gov't Pre–Trial Memorandum at 31. The transfer of Garrison shares to the banks was characterized as a "constructive non-sale," based on Dr. McDonald's conclusion

that the "exit strategy" anticipated that Coltec would reacquire the Garrison stock in five years and hence the transfer was not genuine, but only one "primarily a matter of form." *Id.* at 31–32. Dr. McDonald relied on Dr. Kolbe's probability model, which indicated that it was highly likely that the put price of the stock under the Shareholders Agreement would be more than $40 when the put option could be exercised after five years, and that the shares would be purchased at the call price of $40. DX 1014 at 22, 25–27; TR 1913, 2226. Dr. Kolbe, however, was not cognizant of the fact that Coltec had no legal obligation to buy back the stock from the Banks at $40, or at any price, unless the Banks exercised their put options. JX 75 at § 3.3; TR 289, 1984–86; A–TR 172. Accordingly, after hearing all of the testimony at trial,[28] Dr. McDonald stated that "there is ... more probability than I realized at the outset that there might have been a price below $40" [TR 2217] and that "there seems to be a greater amount of expected value calculations in these scenarios than I had realized," which "implies that there may have been a greater probability of the stock being worth less than $40." TR 2235. Thus, Dr. McDonald reconsidered his initial conclusion stating: "once you allow substantial amounts of risk, I'm not sure I can offer a bright line test for whether a constructive non-sale has occurred." TR 2228. And, so the Government's constructive non-sale theory deconstructed.

Taking a different tact, Dr. Ball testified that he considered the transfer of Garrison stock to the Banks to be a loan. TR 2001, 2056–59, 2071. The Banks, however, did not treat the purchase as a loan. TR 1525, 2602–03. Dr. Ball's conclusion, however, was premised more on the assumption that the put and call options would be exercised and the Garrison stock would revert to Garlock.

---

**28.** During trial, Dr. McDonald heard Mr. Andolino's testimony about the real-life difficulty of selling Garrison stock because most potential "sophisticated investors" viewed the investment as too risky. TX 7 at ¶¶ 18–25; TR 2453–57, 2464. Dr. McDonald also learned that the Banks rejected the initial offer on the stock, negotiated to obtain better terms, and viewed the investment as highly risky. TX 7 at ¶¶ 18–25; TR 2453–54, 2458–63. Indeed, First Union's representative testified that there was a high likelihood that the put price in five years would be less than $40. TR 1528–29. NationsBank's representative also testified that he thought it was not likely that its stock would be worth $40. TR 1078. In addition, Dr. McDonald learned that the Banks recorded the transaction on their internal books as an investment in equity. TR 1525, 2602–03.

TR 2071–77. Unfortunately, Dr. Ball testified that he was advised by the Government that there was a substantial probability that the put would be exercised. TR 206–77. That did not happen. Moreover, as discussed above, the Garrison stock neither had a maturity date nor fixed return. *See* HENN, at 410. Therefore, the court has determined the transfer of Garrison stock to the Banks was not a loan.

For these reasons, the court has determined that the transfer of Garrison stock to the Banks by Garlock was a sale of equity.

### b. The Sale Of Garrison Stock To The Banks Was Conducted At Arm's Length.

In *Higgins v. Smith,* 308 U.S. 473, 475–76, 60 S.Ct. 355, 84 L.Ed. 406 (1940), the United States Supreme Court held that a taxpayer's losses were not *bona fide* because "the transaction was not conducted at arm's length and because the taxpayer retained the benefit of the securities[.]" *Cottage Savings Association v. Commissioner,* 499 U.S. 554, 568, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991). The court has determined in this case that the sale of Garrison stock to the Banks was conducted at arm's length.

The Banks secured counsel and independent outside consultants to conduct due diligence, not only about the business terms, but about the potential that the Banks could find themselves subject to veil piercing claims. TR 316, 1071, 1487, 1496, 1517–19, 2575–76, 2586–88. The terms of the Stock Purchase Agreement between Garlock and the Banks and the Shareholders Agreement between Coltec and the Banks were subject to intense business negotiations. JX 67 at 2–4, Exh. 3; TR 312–14, 1071–78, 1500, 1514–15, 1520–26, 2579, 2603–04. In fact, on more than one occasion, the transaction appeared to fall apart over the price of the put options. JX 66; PX 136 at COLT 17129–30; TR 311–14, 1500–03, 1514–15, 1522–23, 1534–39, 2604.

Stewart was charged with the task of evaluating the insurance coverage estimated by Kahn. JX 64; TR 510–11, 621–22. Stewart issued a report that concluded:

> [T]he kind of exercise that Kahn Consulting performed to calculate insurance recoveries is reasonable, and, in fact, if asked the same question, we probably would have taken the same approach. But we think its limitations must be understood. Regardless of the accuracy of the Tillinghast projections of claims, the nature of the Kahn Consulting projections of insurance recoveries is that they are best-case estimates and hence the risk is one-sided.

TX 64 at BA 0965. Clearly, the Banks were well advised and on notice that the purchase of Garrison stock was a highly risky investment, a message that was repeated in the December 3, 1996 Offering Memorandum. JX 73 at C273, 278–79, 289; TR 1526–29, 1007–78; *see also* JX 50 at BA 0832; JX 67 at 2. To further protect their concerns about "veil piercing," the Banks required Coltec to indemnify them and to keep the transaction confidential. JX 75 at §§ 5.4–5.5; TR 316–18, 1518–19.[29]

The Banks also required an opinion from counsel that the Stemco Note and Garlock Note were enforceable. JX 60 at COLTEC 2248; JX 62 at COLTEC 5146; JX 75 at § 5.4(d); PX 163 at G 16582–87; TR 2597–98. In this case, a fact-based opinion was not rendered by independent outside counsel, but instead by Kronish, Lieb, which was designated on the opinion letter as Coltec's "special counsel." Although that may have been commercially acceptable to the Banks, the opinion remains problematic to the court, particularly in light of its contingent nature and direct dependence on the opinion of Coltec's General Counsel. *See Long Term Capital Holdings v. United States,* 330 F.Supp.2d 122, 146 (D.Conn.2004) (observing where the opinions contain "no legal reasoning or analysis. [But] [r]ather ... set out the factual underpinning for the legal conclusions," the

---

**29.** In addition, KPMG was retained to review the "reasonableness" of the Tillinghast and Kahn Reports. DX 450; PX 145, 150; JX 48; TR 512–13, 517–18, 1486, 1545–52; 1572–77, 1599–1605, 1611, 1701–04, 2708–09. KPMG advised the Banks that "the greatest risk of error lies in the possibility that history will not repeat itself.... [Therefore], it is likely that current estimates would underestimate the magnitude of the [Garlock] liability." PX 145 at BA 1054; PX 150 at BOA 819.

court should closely scrutinize the transaction.). The deficiencies in the opinion letter, however, do not change the court's conclusion that the clear weight of the evidence established that the transaction with the Banks was conducted at "arm's length," even though the Banks were most willing to become an investor in Garrison to curry favor with Coltec. But, as Dr. Kolbe, the Government's expert, accurately described this was a "small deal for [the Banks] used to bigger deals." TR 1842.

Accordingly, the court has determined that the negotiations between Coltec, Garlock, and the Banks were conducted at "arm's length."

## G. The Court's Resolution Of Issues Concerning The Doctrine Of "Economic Substance."

■ The "economic substance" doctrine, a composite of the "business purpose" doctrine, the "substance over form" doctrine, and the "sham transaction" doctrine, is said to have evolved from the following dicta in *Gregory*:

[T]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.... [F]ixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business[.] ... No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no

other function. When that limited function had been exercised, it immediately was put to death.... [T]he transaction upon its face lies outside the plain intent of the statute.

*Gregory,* 293 U.S. at 469–70, 55 S.Ct. 266; *see also ACM Partnership v. Commissioner,* 157 F.3d 231, 247–48 (3d Cir.1998).

A leading tax scholar, however, has observed that:

It is doubtful that the Supreme Court in *Gregory* intended to create a business purpose requirement of the sort that now encumbers the tax law.... Although it is clear enough today that a reorganization must satisfy the business purpose requirement, the exact contours and proper role of the requirement have been the subject of much debate during the more than half century since *Gregory.* It is clear enough that a transaction undertaken solely for tax avoidance purposes will fail the business purpose requirement and consequently will not qualify as a tax-free reorganization. It seems no less clear, if redundant, that a transaction undertaken primarily for valid business purposes will satisfy the business purpose requirement. Between these obvious poles resides more than a little uncertainty.

GINSBURG & LEVIN ¶ 609.1, at 6–205.

As a matter of litigation strategy, the Government clearly anticipated that the court might well conclude that the Garrison transaction and subsequent transactions with the Banks satisfied the requirements of the Code. Therefore, to trump Coltec's navigation of the statutory currents and cross currents discussed herein, the "economic substance" doctrine would have to be invoked for the Government to prevail. A–TR 66.[30] The Government's briefs, however, cited no supporting legal authority from the United States Court of Appeals for the Federal Circuit on this issue. *See* Gov't Pre–Trial Mem-

---

**30.** *See* A–TR 76–77 (Government's Counsel):

"I understand that tax law is statutory.... But when you start looking at it you should look— you should look for a common sense correlation between the tax law and financial accounting and economics, and be very skeptical of someone who tells you that they diverge as much as Coltec does in this case.

What they've told you is that the smart people who came up with this transaction are alchemists. They turn tax gold. They make tax gold out of liability drek.

We all know that the alchemists were lying, that they were fabricating things."

orandum at 33–34; Gov't Post–Trial Memorandum at 37–39. During oral argument, the court invited the Government to provide that authority. A–TR 123. In response, on October 4, 2004, the Government provided the court with a list of "binding precedent" that "supports the principle that economic substance, and not *mere* formal compliance with the Code, must inform the interpretation and application of the tax law." Oct. 4, 2004 Gov't Supplemental Letter at 1 (emphasis added).

Turning first to cases from the United States Supreme Court, it is certainly true that the Court has decided tax cases invoking doctrine. *See, e.g., Gregory,* 293 U.S. at 469, 55 S.Ct. 266; *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945) ("A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."). A careful reading of other cases cited by the Government, however, reveals that the Court resolved the tax question at issue first by looking to the Code and utilized doctrinal language only to further support its conclusion. *See, e.g., Commissioner v. Clark,* 489 U.S. 726, 738, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989) (emphasis added) (wherein the Court relied on "[o]ur reading of the statute ... [which] *is reinforced* by the well established 'step-transaction' doctrine[.]"); *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960) (emphasis added) (in determining "whether the transactions created a true obligation to pay interest[,][u]nless that meaning plainly appears, we will not attribute it to Congress.... *We, therefore, look to the statute* ... to its construction for evidence that Congress meant in § 264(a)(2) to authorize the deduction of payments made under sham transactions entered into before 1954."). *Id.* at 367, 81 S.Ct. 132. Moreover, in none of these cases was the issue raised that, under constitutional separation of powers, judges should determine congressional intent by the language of the Code, rather than deciding

what tax policy should be. *See United States v. Fausto,* 484 U.S. 439, 449, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (explaining that congressional intent is found in "the statutory language ... [and] the structure of the statutory scheme"); *see also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 544–45, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (Scalia, J., concurring in judgment in part and dissenting in part) ("[O]ur job is to interpret Congress's decrees ... neither narrowly nor broadly, but in accordance with their apparent meaning.... Congress's intent [is] revealed by the text, structure, purposes, and subject matter of the statutes involved."). Moreover, in light of the Court's unanimous opinion in *Nebraska Department of Revenue v. Loewenstein,* 513 U.S. 123, 115 S.Ct. 557, 130 L.Ed.2d 470 (1994) the current vitality of the "economic substance" doctrine certainly is not clear. *Id.* at 134, 115 S.Ct. 557 (emphasis added) (declining to apply the economic substance doctrine and stating: "*[W]hatever the language [Frank Lyon Company v. United States,* 435 U.S. 561, 583–84, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978)] *... may mean,* our decision in that case ... was founded on an examination ... of 27 specific facts.").

The three most recent precedential cases cited by the Government from the United States Court of Appeals for the Federal Circuit also warrant a close reading. In *Holiday Village Shopping Center v. United States,* 773 F.2d 276 (Fed.Cir.1985), the question presented was whether the liquidation of a corporation's interest in a limited partnership was subject to the recapture provisions of federal tax law regarding accelerated depreciation on certain property where a partnership was involved. Thus, the relevant inquiry was whether it was more appropriate to treat the partnership as an aggregate of the partner's institutional interests rather than as a separate entity. *Id.* at 279. In determining that the partnership should be disregarded, "*in this case,*" our appellate court merely acknowledged that "[c]ourts, however, will focus on the substance rather than on the form of a transaction where necessary to reflect the economic realities of the situation." *Id.* at 280 (citing *Gregory*) (emphasis added). Without further discus-

sion, much less an endorsement of the economic substance doctrine, the Federal Circuit held only that "it is appropriate in this case to disregard the partnership[.]" *Id.* In light of the fact that the federal appellate court undertook no analysis of the "economic realities" attributed to *Gregory* and clearly limited its holding to the facts of the case, the court does not discern any directive requiring it to resolve the instant case under the economic substance doctrine.

In *Executive Jet Aviation, Inc. v. United States,* 125 F.3d 1463 (Fed.Cir.1997), the United States Court of Appeals for the Federal Circuit was asked whether a taxpayer was involved in the business of transporting persons or property for hire and therefore was subject to a transportation tax. In affirming a determination by the United States Court of Federal Claims that the plaintiff-appellant was subject to the applicable tax, our appellate court held:

> We begin our analysis with the language of the statute. Where the statute's language is plain, "the sole function of the courts is to enforce it according to its terms." We do not agree that [the [C]ode sections at issue] are ambiguous because they do not define the words "transportation" and "transporting." It is well settled that the legislature's failure to define commonly-used terms does not create ambiguity, because the words in a statute "are deemed to have their ordinarily understood meaning." Moreover, "[t]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and ... ingenuity and study ... would discover."

*Id.* at 1468 (citations omitted). After framing "[t]he central question [as] whether EJA was in the 'business of transporting persons or property for hire by air,'" as an aside, the Federal Circuit cited *Gregory* and a footnote, *Terry Haggerty Tire Co., Inc. v. United States,* 899 F.2d 1199, 1201 n. 2 (Fed.Cir. 1990), for the proposition that "'for tax purposes the substance rather than the form of a transaction is generally controlling.'" *Id.* at 1469. Albeit that is so, but where the language of the Code is clear, the "substance

rather than form" doctrine is irrelevant. The United States Court of Appeals for the Federal Circuit well understood this when it further held: "[A]bsent a clear showing of contrary legislative intent, the plain meaning analysis of the statutory language begins and ends the judicial inquiry." (citations omitted). *Id.* at 1470; *see also Seggerman Farms, Inc. v. Commissioner,* 308 F.3d 803, 808 (7th Cir. 2002) ("Absent any ambiguity on the face of a statute, it is the province of the legislative branch, rather than the judiciary, to safeguard the taxpayer from undue hardship[.]"); *The Limited, Inc. v. Commissioner,* 286 F.3d 324, 336 (6th Cir.2002) ("[I]t is not the [judiciary's] role to inject its own policy determinations into the plain language of statutes."); *Rubin v. Commissioner,* 429 F.2d 650, 653 (2d Cir.1970) ("Resort to 'common law' doctrines of taxation ... have no place where, as here, there is a statutory provision adequate to deal with the problem presented."). For these reasons, the court discerns no instruction from the United States Supreme Court and the United States Court of Appeals for the Federal Circuit contrary to the analysis and conclusion reached herein regarding the "economic substance" doctrine.

In any event, the court already has considered and held that Coltec satisfied the tax avoidance and business purpose tests in Section 357(b), therefore, *ipso facto,* the "economic substance" doctrine is satisfied, since that doctrine requires proof of at least one of these tests. *See, e.g., Frank Lyon,* 435 U.S. at 583–84, 98 S.Ct. 1291 (holding "[W]here, as here, there is a genuine multi-party transaction with economic substance which is compelled ...by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties."); *United Parcel Service of America, Inc. v. Commissioner,* 254 F.3d 1014, 1018 (11th Cir.2001) ("This economic-substance doctrine ... provides that a transaction ceases to merit tax respect when it has no 'economic effects other than the creation of tax benefits [i.e., tax avoidance].'"); *Northern Indiana Public Service Co. v. Commissioner,* 115 F.3d 506, 512 (7th Cir.

1997) ("[The economic substance doctrine] engender[s] the principle that a corporation *and the form of its transactions* are recognizable for tax purposes, despite any tax-avoidance motive, so long as the corporation engages in *bona fide* economically-based business transactions."); *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91 (4th Cir.1985) (emphasis added) ("To treat a transaction as a sham, the court must find that the taxpayer was motivated by *no business purposes* other than obtaining tax benefits in entering the transaction[.]"); *Black & Decker Corp. v. United States,* No. WDQ–02–2070, 2004 U.S. Dist. LEXIS 21201, at *6 (N.D.Md. Oct. 22, 2004) (holding that a "court may not ignore a transaction that has economic substance, even if the motive for the transaction is to avoid taxes."). Moreover, from the "standpoint of the prudent investor," the Garrison transaction not only appeared to place one more barrier in the way of veil piercing claims, but it provided the B.F. Goodrich Corporation with a sufficient comfort level to purchase all of the Coltec Group in 1999. *See Gilman v. Commissioner,* 933 F.2d 143, 147–48 (2d Cir.1991) ("[A] court could either inquire whether there were any non-tax economic effects or use the analysis under Section 183. Whether the terminology used was that of 'economic substance, sham, or Section 183 profit motivation' was not critical; what was important was reliance on objective factors in making the analysis.") (citations omitted); A–TR 137–47, 152–56.

In A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW (1997), Justice Scalia presents a compelling argument that the courts must interpret statutes as Congress wrote them, rather than what they "ought to mean." *Id.* at 3–37. Emphasizing the danger of relying on judicial results-oriented rationale, rather than adhering to the direct of statutory language selected by Congress to express its will, Justice Scalia reminded judges of the words of an early 19th century legal scholar, who warned:

Judge-made law is ex post facto law, and therefore unjust. An act is not forbidden by the statute law, but it becomes void by judicial construction. The legislature could not effect this, for the Constitution forbids it. The judiciary shall not usurp legislative power, says the Bill of Rights: yet it not only usurps, but runs riot beyond the confines of legislative power.

Judge-made law is special legislation ... The judge makes law, by extorting from precedents something which they do not contain. He extends his precedents, which were themselves the extension of others, till, by this accommodating principle, a whole system of law is built up without the authority or interference of the legislator.

*Id.* at 10–11 (quoting Robert Rantoul, Oration at Scituate (July 4, 1836) in *Kermit L. Hall et al., American Legal History* 317, 317–18 (1991)).

The public must be able to rely on clear and understandable rules established by Congress to ascertain their federal tax obligations. If federal tax laws are applied in an unpredictable and arbitrary manner, albeit by federal judges for the "right" reasons in the "right case," public confidence in the Code and tax enforcement system surely will be further eroded. *See* John F. Coverdale, *Text As Limit: A Plea For A Decent Respect For The Tax Code,* 71 TUL. L. REV. 1501, 1507 (May 1997) ("A decision rule that prohibits courts from adopting antitextual interpretations reflects the proper role of the legislature and the courts under our democratic constitutional system, it respects the distinctive characteristics of the Code, and it promotes the values of certainty and predictability that are very important when dealing with tax statutes."). Moreover, as a legal scholar cited by the Government, observed:

The economic substance test is dizzyingly complex.... This complexity arises from a number of interrelated factors. First, the test is best seen as a technique of statutory interpretation, which poses open-ended and unanswerable questions. Second, the test must be applied to a near-infinite variety of economic activities and transactions. Third, the present treatment of capital is inconsistent and to some extent incoherent. Taxpayers can exploit this incoherence by structuring transactions that produce tax benefits out of thin air. And conflicting rules make it difficult, sometimes, to deter-

mine the "correct" treatment of a particular transaction. Finally, only a few cases have been decided under the economic substance test, leaving open multiple interpretations of the doctrine.

Joseph Bankman, *The Economic Substance Doctrine*, 74 S. CAL. L. REV. 5, 29 (2000–01); *see* Gov't Post–Trial Memorandum at 38, 40 (citing Bankman). This candid assessment of the deficiencies of "economic substance" doctrine certainly does not suggest a compelling case for the court to jump into to "fill in some of the lacunae and resolve some of the [doctrine's] ambiguities." Bankman, 74 S. CAL. L. REV. at 29. Instead, as Professor Bankman advises, "Congress may have no choice but to engage in substantive law reform. Some shelter activity will take place under even the most utopian tax structure. However, the current tax treatment of capital needlessly multiplies shelter opportunities and provides a fertile breeding ground for shelter development." *Id.* at 29–30. The court agrees.

After Professor Bankman's article was published, Congress debated several proposals to codify the "economic substance" doctrine and declined to do so. *See, e.g.,* CARE Act. S. 476, 108th Cong. § 701 (2003); Jobs and Growth Tax Relief Reconciliation Act, S. 1054, 108th Cong. § 301 (2003); Abusive Tax Shelter Shut Down and Taxpayer Accountability Act, H.R. 1555, 108th Cong. § 101 (2003). In fact, a few days ago Congress passed a major federal tax bill, but again declined to codify the "economic substance doctrine." *See* American Jobs Creation Act of 2004, H.R. 4520, 108th Cong. (2004).

Under our time-tested system of separation of powers, it is Congress, not the court, that should determine how the federal tax laws should be used to promote economic welfare. *See, e.g., Gitlitz v. Commissioner,* 531 U.S. 206, 220, 121 S.Ct. 701, 148 L.Ed.2d 613 (2001) ("Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address ... policy concern[s]."); *United States v. Byrum,* 408 U.S. 125, 135, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972) ("When a principle of taxation requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules[.]"); *see also American Trucking Ass'ns v. Smith,* 496 U.S. 167, 201, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) (Scalia, J., concurring) (reminding the judiciary that their role "is to say what the law is, not to prescribe what it shall be."). Accordingly, the court has determined that where a taxpayer has satisfied all statutory requirements established by Congress, as Coltec did in this case, the use of the "economic substance" doctrine to trump "mere compliance with the Code" would violate the separation of powers.

### CONCLUSION

For the aforesaid reasons, the court holds that the Coltec Group is entitled to a refund of $82,803,049 for the federal tax year ending on December 31, 1996.

**IT IS SO ORDERED.**

Appendix A (Coltec Flowchart)
## Basic Computation Flow Chart

Section 358(a) determines Garlock's basis in Garrison stock.
- Stemco Note = $375m
- Anchor Stock = 4m
  Total Basis    $379m

Under §358(d)(1), did contingent "deductible when "paid" asbestos obligations reduce Garlock's basis in Garrison stock?

No

EITHER                                    OR

Under general income tax principles, "deductible when paid" liabilities have been disregarded.
- Crane, 331 U.S. 1 (1947)
- Focht, 68 T.C. 223 (1977)
- §461(h)(2)(C)

Section 357(c)(3) and §358(d)(2) codified Crane and Focht in 1978. IRC Section 358(d)(2) excludes from section 358(d)(1) "deductible when paid" liabilities by cross-reference to the type of liabilities described in §357(c)(3).

Garlock's tax basis in Garrison stock remained $379m.

*Notes to Basis Computation Flow Chart*

1. Garlock's basis was determined by *§ 358*. Under *§ 358(a)(1)*, Garlock's basis is (a) its basis in the property it exchanged for the stock (the Stemco Note and the stock of Anchor), subject to (b) possible specified decreases or increases.

2. There is no dispute as to Garlock's basis in the property it exchanged. It was $379,206,091, consisting of (a) the basis of the Stemco Note, $375 million (stipulated by the government), and (b) the basis of the Anchor stock, $4,206,091 (never disputed by the government).

3. The dispute, rather, is whether or not the assumption of the contingent liabilities by Garrison reduced Garlock's basis.

The possible reductions to basis are specified in § 358(a)(1)(A). That provision does *not* list an assumption of liabilities. It does, however, list "money received by the taxpayer [Garlock]."

4. The rules regarding liability assumptions are set out in *§ 358(d)*.

Section 358(d)(1) sets out the general rule: an assumption of a liability of the taxpayer shall for purposes of § 358 be treated as "money received by the taxpayer" (which would reduce basis).

5. However, *contingent* ("deductible when paid") liabilities are not liabilities for purposes of §§ 357 or 358. *See* Plaintiff's Pre–Trial Brief at 14–16; Plaintiff's Post–Trial Brief at 3–6; Oral Argument, Tr. 228:22–230:10. *See also*, Kahn and Oesterle, *A Definition of Liabilities*, 73 Michigan Law Review Vol. 73, 461 at 470 (1975). Legislative history demonstrates that the exclusion of the assumption of deductible liabilities under the *Crane* doctrine was incorporated into Section 357 and 358: The term "liabilities" in those sec-

tions refers only to obligations the transfer of which would cause realization of income to the transferor under *Crane.*" Thus, § 358(d)(1) was inapplicable, and the assumption of the contingent liabilities did not reduce Garlock's basis in the stock.

6. Further, *even if* the contingent liabilities were liabilities within the meaning of §§ 357 and 358, § 358(d)(1) would remain inapplicable.

That is because *§ 358(d)(2)* sets out an exception to (d)(1): § 358(d)(1) "shall *not* apply" to the amount of any liability "excluded under *section 357(c)(3)*." Emphasis added.

7. Section 357(c)(3) provides in relevant part that the amount of "a liability the payment of which ... would give rise to a deduction ... *shall be excluded* in determining the amount of liabilities assumed ...." Emphasis added.

There is no dispute that "the payment" of the asbestos liabilities "would give rise to a deduction."

8. As a result, § 358(d)(1) was not applicable for that reason as well, and the assumption of the contingent liabilities did not reduce Garlock's basis in the stock.

## Appendix B (Government Flowchart)